ZAREMBA EQUIPMENT, INC v HARCO NATIONAL INSURANCE
COMPANY

Docket Nos. 298221 and 298755. Submitted May 16, 2013, at Traverse
    City. Decided July 25, 2013, at 9:05 a.m. Leave to appeal sought.
    Zaremba Equipment, Inc., brought an action in the Otsego Circuit
    Court against Harco National Insurance Company and Patrick
    Musall, who was Harco's agent, after a fire destroyed plaintiff's
    building and its contents. The complaint alleged negligence, fraud,
    innocent misrepresentation, breach of contract, promissory estop-
    pel, and other claims, all related to the adequacy of the coverage
    provided in the insurance policy and representations that Musall
    made or failed to make concerning that coverage. The jury found
    for plaintiff on all of its claims and awarded the damages that
    plaintiff requested. The court, Dennis F. Murphy, J., denied defen-
    dants' motions for judgment notwithstanding the verdict (JNOV)
    and a new trial. Defendants appealed. The Court of Appeals,
    BORRELLO and GLEICHER, JJ. (O'CONNELL, P.J., concurring in part and
    dissenting in part), affirmed in part, reversed in part, vacated in
    part, and remanded for a new trial. 280 Mich App 16 (2008)
    (Zaremba I). On remand, a second trial was held before a new jury.
    The new jury found Musall negligent and that he had made an
    innocent misrepresentation, but rejected plaintiff's fraud claim.
    The jury further determined that plaintiff's comparative negli-
    gence was a proximate cause of its damages. The trial court, Janet
    M. Allen, J., rejected defendants' motions for JNOV and a new trial
    and entered judgment for plaintiff in the amount of $1,245,264.40
    plus interest. The court subsequently awarded $134,739.33 in
    costs and attorney fees. Defendants appealed and plaintiff cross-
    appealed.

       The Court of Appeals held:

       1. Under the law of the case doctrine, if an appellate court has
    ruled on a legal question and remanded the case for further
    proceedings, the legal questions thus determined by the appellate
    court will not be differently determined on a subsequent appeal in
    the same case when the facts remain materially the same. Defen-
    dants' argument that plaintiff's failure to read its policy doomed
    its negligence claim was rejected in Zaremba I. The central holding

in *Zaremba I* identified plaintiff's failure to read its policy as comparative fault to be weighed against Musall's negligence. That determination constituted the law of the case. The parties also litigated plaintiff's innocent misrepresentation claim in accordance with the analysis set out in *Zaremba I*. Thus, the trial court correctly denied defendants' motion for JNOV based on plaintiff's failure to read its insurance policy.

2. Under the common law, an insurance agent whose principal is the insurance company owes no duty to advise a potential insured about any coverage. However, there is an exception to the general no-duty rule when an event occurs that alters the nature of the relationship between the agent and the insured. A special relationship may arise, pursuant to which an agent acquires greater duties to the customer, when (1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured. Contrary to defendants' argument, in this case abundant evidence supported plaintiff's claim that Musall stepped from the role of order taker into that of insurance advisor. By making coverage recommendations, misrepresenting the coverage provided in the policy, and assuming an obligation to appraise or survey the property to calculate its replacement value, Musall established a duty of care different from that of an ordinary insurance agent. Accordingly, the trial court properly rejected defendants' challenge to the sufficiency of the evidence.

3. An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding. Reversal is only required when the prejudicial statements reveal an intent to inflame or otherwise prejudice the jury, or to deflect the jury's attention from the issues involved. Despite breaches of the norms of professional conduct by counsel for both sides, the record does not indicate any studied purpose to prejudice the jury or to divert the jury's attention from the merits of the case. Nor did the objections, speeches, comments, and arguments of counsel qualify as inflammatory, extreme, or deliberately misleading. Further, much of the challenged conduct by plaintiff's counsel occurred outside the presence of the jury. The arguments made only to the trial court did not deprive defendants of a fair trial. A "speaking objection" is an objection that contains more information than the judge needs to rule on the objection. In this case, the trial court

recognized the problem of speaking objections, admonished counsel to avoid them, and properly instructed the jury that the lawyers' statements and arguments were not evidence. Accordingly, defendants' claim that speaking objections tainted the jury's ability to fairly decide the case was without merit. Nor did plaintiff's counsel's comments on Musall's credibility deprive defendants of a fair trial given that the record confirmed that Musall was less than entirely truthful and forthcoming when answering some of plaintiff's counsel's questions. Although plaintiff's counsel succeeded in improperly suggesting to the jury that the insurance policy was difficult to understand, contrary to the holding in *Zaremba I,* the trial court's instructions on the matter did not permit the jury to accept that excuse for failing to read and understand the policy. Thus, to the extent that plaintiff's counsel made incursions into improper territory, the comments constituted harmless error. The trial court did not err by denying defendants' motion for JNOV based on plaintiff's counsel's alleged misconduct.

4. Only when verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside. In this case, the jury determined that plaintiff was 30 percent comparatively negligent with regard to the general negligence count and 20 percent comparatively negligent with regard to the innocent misrepresentation claim. The trial court properly rejected defendants' objection to the proposed judgment on the basis of the differing percentages of comparative negligence given the distinct arguments that were made concerning comparative fault. The jury reasonably could have concluded that plaintiff bore a higher percentage of comparative fault with regard to the general negligence claims because of plaintiff's failure to read its policy, and a lesser percentage for providing Musall with incorrect information for the appraisal. The trial court did not err by declining to recognize only the greater finding of comparative fault when entering judgment on the alternative theories of recovery or in declining to order a new trial for that reason.

5. Under MCR 2.403(O)(1), if a party has rejected a case evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation. The trial court did not err in its award of case evaluation sanctions. The costs generated in connection with both trials were necessitated by the rejection of the case evaluation because they arose after the rejection. The cost of two trials was part of the risk assumed by defendants when they rejected the evaluation.

6. With regard to plaintiff's cross-appeal, the law of the case doctrine did not preclude the jury from assessing plaintiff's comparative fault related to the innocent misrepresentation claim. The law of the case doctrine is a general rule that applies only if the facts remain materially the same. Because the facts adduced at the second trial differed meaningfully from those adduced at the first trial, the trial court properly submitted to the jury the question of plaintiff's comparative fault for Musall's misrepresentation.

Affirmed.

*Howard & Howard Attorneys PLLC* (by *Michael F. Wais* and *Michael O. Fawaz*) for plaintiff.

*John R. Monnich, PC* (by *John R. Monnich*), and *Jacobs and Diemer, PC* (by *John P. Jacobs* and *Timothy A. Diemer*), for defendants.

Before: RONAYNE KRAUSE, P.J., and GLEICHER and BOONSTRA, JJ.

PER CURIAM. This insurance coverage dispute arose in 2003, when a fire consumed the primary building occupied by plaintiff Zaremba Equipment, Inc. Defendant Harco National Insurance Company sold Zaremba the insurance policy in effect at the time of the fire. The policy stated limits of $525,000 for the building and $700,000 for its contents. After the loss, Zaremba learned that it would cost far more than those limits to replace the building and its contents.

Zaremba brought suit, complaining that defendant Patrick Musall, an insurance agent employed solely by Harco, negligently advised Zaremba regarding the appropriate amount of replacement coverage for the business and misrepresented the nature and extent of the coverage purchased. Zaremba further alleged that Musall improperly appraised the building at a value far lower than its actual replacement cost, and committed

fraud. Defendants denied that Musall performed an appraisal and asserted that had Zaremba bothered to read its policy, it would have understood its clearly stated coverage limits. In 2009, an Otsego County jury found in Zaremba's favor and awarded the corporation $2,353,778 exclusive of costs, attorney fees, interest, and case evaluation sanctions.

This Court reversed and remanded for a new trial, holding that the trial court had erroneously refused to instruct the jury that Zaremba bore a duty to read its insurance policy. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16; 761 NW2d 151 (2008) (*Zaremba I*). Our opinion explained that Zaremba's admitted failure to read its policies could constitute comparative negligence. We directed that a second jury assess the comparative fault of both Zaremba and Musall when considering Zaremba's negligence claims.

A properly instructed jury found Musall negligent and determined that Musall had made an innocent misrepresentation, but rejected Zaremba's fraud claim. The jury further determined that Zaremba's comparative negligence constituted a proximate cause of its damages. The trial court entered judgment for Zaremba in the amount of $1,245,264.40 plus interest, and subsequently awarded $134,739.33 in costs and attorney fees.

Defendants raise a number of appellate challenges to the verdict and postverdict awards. Defendants insist that Zaremba's failure to read the policy should have operated as a complete bar to recovery, that Musall owed Zaremba no duty of care, and that Zaremba's counsel repeatedly distracted the jury by injecting irrelevancies, including the length and interpretive difficulty of the insurance policy. Zaremba cross-appeals, arguing that the jury should not have been permitted to

consider Zaremba's comparative negligence in relation to Musall's innocent misrepresentations.

The law of the case disposes of defendants' first two arguments, and the trial court's oft-repeated instruction that the lawyers' comments were not evidence defeats the third. Because facts emerged during the second trial substantiating defendants' argument that Zaremba bore responsibility for Musall's innocent misrepresentation, the trial court correctly ruled that a comparative negligence analysis applied to this claim. Although the trial was far from perfect, we find no errors warranting reversal.

I. UNDERLYING FACTS AND PROCEEDINGS

The evidence developed during the second trial generally duplicated our previous description of the relationship between Zaremba and Musall:

> Musall testified that since 1998 or 1999 he had met with Jimmy Zaremba,[1] plaintiff's business manager, at least twice a year to discuss plaintiff's insurance needs, Harco's available coverages, and potential policy limits. Musall admitted that at some point before plaintiff accepted Harco's 2002-2003 insurance proposal, Jimmy presented a "Customgard John Deere Insurance Proposal" prepared for plaintiff. The Deere insurance proposal included a "Building Coverage" limit of $450,000 and identified an applicable "Extended Recovery Endorsement" that included "Guaranteed Replacement Cost." Musall conceded that Jimmy had asked him to "meet or beat" the Deere proposal and expressed a desire "to be fully insured." Musall utilized a software program called "Marshall & Swift" to prepare a "cost estimate" for reconstructing plaintiff's building, which calculated a building value of $494,449. According to Jimmy, Musall represented that Marshall & Swift was "the leader in the industry, and this is what

---

[1] For the sake of clarity, we will follow the lead of *Zaremba I* and refer to James "Jimmy" Zaremba by his nickname in this opinion.

insurance agents use all the time to come up with evaluations on a building." Although Musall did not recall telling Jimmy about the Marshall & Swift estimate, he admitted that after its preparation, plaintiff increased its building coverage limit to $525,000.

Musall also conceded that he made specific recommendations in response to Jimmy's request that plaintiff be "fully insured." He admitted that he would have recommended more coverage if he had known that it would cost $1,192,000 to replace the building because the "intent was there" to insure plaintiff "for the cost of replacing the building." Musall further explained that if Jimmy had asked for $1.5 million of building coverage, Musall would have advised him that "I didn't feel he needed that much coverage."

Jimmy recalled that in July 2001 a car had run into a nearby restaurant, killing some customers. Jimmy heard that the restaurant owner "had a holy nightmare" with his insurance company and realized that if something happened to plaintiff's building, zoning issues would preclude rebuilding in the same location. At about the same time, Jimmy learned of Deere's "guaranteed replacement coverage" and consulted Musall to discuss the adequacy of plaintiff's coverage and to communicate his desire that plaintiff be "fully insured." Jimmy asked Musall to compare plaintiff's 2001 Harco coverage, which included an 80 percent coinsurance provision that obligated plaintiff to cover 20 percent of its own insured losses, with the Deere proposal. According to Jimmy, Musall represented that for $500 less than the Deere quotation, Harco would provide a building policy limit of $525,000 and that "with the replacement costs, we would be fully insured." [*Id.* at 23-24.]

Based on these facts, we held that Zaremba established that Musall and Zaremba shared a "special relationship" pursuant to *Harts v Farmers Ins Exch*, 461 Mich 1, 10-11; 597 NW2d 47 (1999). Using *Harts* as our guide, we described the parties' respective duties of care as follows: "[W]hen an insurance agent elects to

provide advice regarding coverage and policy limits, the agent owes a duty to exercise reasonable care. The insured has a duty to read its insurance policy and to question the agent if concerns about coverage emerge." *Zaremba I*, 280 Mich App at 36.

Given our holding, we anticipated that the second trial would generally focus on whether: (1) Musall negligently appraised the replacement costs of Zaremba's building and contents, (2) Musall misrepresented that the Zaremba policy included "replacement coverage," (3) Musall negligently failed to provide Zaremba with the replacement coverage it had ordered, and (4) Zaremba was comparatively negligent. With regard to the last issue, we stated, "A jury could reasonably conclude that plaintiff's failure to read its 2002-2003 policy qualified as a proximate cause of its failure to obtain clarification regarding the Harco policy limits before the February 2003 fire." *Id.* at 35.

Our opinion drew a distinction between Zaremba's claims arising from Musall's advice and representations and Musall's appraisal of the building and its contents. Regarding the appraisal allegation, we found Zaremba's duty to read the policy inapplicable. We explained, "Plaintiff's policy and related documents do not contain . . . any information that might have called into question the accuracy of the Marshall & Swift computation or Musall's allegedly negligent representation that plaintiff could replace its building within the limits of the policy." *Id.* We pointed out that logically, Zaremba's failure to read its insurance policy "does not represent a proximate cause" of any damages awarded under the negligent appraisal theory of liability. *Id.*

In the second trial, the court's comparative fault and proximate cause instructions tracked the Model Civil Jury Instructions. Neither party objected to the sub-

stance of the instructions.[2] The jury rejected that defendants had committed fraud, but upheld Zaremba's claims of negligence and innocent misrepresentation and awarded damages in the amount of $1,556,448 on each theory. The jury assessed Zaremba as 30 percent comparatively negligent in connection with its negligence claims and 20 percent comparatively negligent with regard to the innocent misrepresentation claim. The trial court determined that Zaremba was entitled to a single satisfaction based on the alternative theories of recovery and awarded the higher of the two resulting figures—$1,245,265.40.

## II. ANALYSIS

### A. JUDGMENT NOTWITHSTANDING THE VERDICT BASED ON ZAREMBA'S FAILURE TO READ THE POLICY

Defendants first contend that the trial court should have granted their motion for judgment notwithstanding the verdict (JNOV) because Zaremba's failure to read its policy negated defendants' tort liability. The "inexorable duty to read" an insurance policy, defendants argue, defeats as a matter of law an insured's subjective beliefs about policy provisions. Defendants further insist that given the unambiguous policy language, Zaremba failed to prove that it reasonably relied on Musall's misrepresentations. We review de novo a trial court's ruling on a motion for JNOV. *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003). "A motion for . . . JNOV should be granted only if the evidence viewed in [the light most favorable to the nonmoving party] fails to establish a claim as a matter of law." *Id.*

---

[2] As discussed in greater detail later in this opinion, Zaremba objected to the trial court's decision to instruct the jury at all regarding Zaremba's comparative fault for Musall's innocent misrepresentations.

Defendants' arguments fly in the face of the law of the case. Our central holding in *Zaremba I* identified Zaremba's failure to read its policy as comparative fault to be weighed against Musall's negligence. This determination constituted the law of the case. It governed the retrial, and it governs this appeal. Defendants have offered no reason that we should disregard the law of the case, and we decline to do so.

Under the law of the case doctrine, "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *CAF Investment Co v Saginaw Twp*, 410 Mich 428, 454; 302 NW2d 164 (1981). Defendants invite us to adopt precisely the same argument they made in *Zaremba I*, that failure to read the policy doomed Zaremba's negligence claims. We need not rehash the reasons we rejected that view; they are plainly spelled out in the first opinion.

Similarly, we decline to revisit our holding regarding Zaremba's innocent misrepresentation claim. We previously explained that Zaremba "cannot prevail on a fraud or innocent misrepresentation theory premised on Musall's representations regarding the policy limits" because the policy unambiguously set forth those limits. *Zaremba I*, 280 Mich App at 40. However,

> plaintiff's fraud and innocent misrepresentation claims also encompassed Musall's statements regarding the accuracy of the Marshall & Swift computation and whether plaintiff could actually replace its building for $525,000. Neither the policy language nor any documents provided by defendants regarding the policy would have shed light on the accuracy of the Marshall & Swift estimate or Musall's representation that the $525,000 coverage limit constituted adequate replacement coverage. Therefore, the

> record could support plaintiff's claims that Jimmy reason-
> ably relied on Musall to accurately evaluate the cost of
> replacing the building and also reasonably relied on Mus-
> all's representation that the Marshall & Swift calculation
> constituted a reasonable assessment of the building's re-
> placement cost. [*Id*. at 40-41.]

Our review of the record reveals that the parties liti-
gated Zaremba's innocent misrepresentation claim in
accordance with our analysis; we detect no error.

### B. JUDGMENT NOTWITHSTANDING THE VERDICT BASED ON INSUFFICIENT EVIDENCE

Next, defendants assert that Zaremba failed to prove
that Musall and Jimmy had a special relationship under
*Harts*, and that the trial court should have granted
JNOV on this ground. According to defendants, the
special relationship theory of liability permitted by the
trial court converts insurance agents into insurance
advisors and appraisal experts, imposes on agents a
duty to know the prospective insured's business better
than the prospective insured, and improperly extends
an agent's duty to "serving as a fact-checker, a business
advisor, appraisal expert or financial planner." "When
reviewing a claim that there was insufficient evidence
presented in a civil case, this Court must view the
evidence in a light most favorable to the plaintiff and
give the plaintiff the benefit of every reasonable infer-
ence." *Scott v Illinois Tool Works, Inc*, 217 Mich App 35,
41; 550 NW2d 809 (1996).

The trial court rejected defendants' sufficiency of the
evidence challenge, finding that viewed in the light
most favorable to Zaremba, "Musall held himself out to
be an expert who could advise Zaremba as to the proper
coverage," and having done that, "Musall assumed a
duty . . . to provide such proper coverage as was re-
quested . . . ." We agree with the trial court.

"[U]nder the common law, an insurance agent whose principal is the insurance company owes no duty to advise a potential insured about any coverage." *Harts*, 461 Mich at 8. Insurance agents, who function "essentially" as "order takers," should be distinguished from insurance counselors, who function as advisors. *Id.* at 9, citing MCL 500.1232. However, the Supreme Court carved out an exception to the general "no duty" rule "when an event occurs that alters the nature of the relationship between the agent and the insured." *Id.* at 9-10. A special relationship may arise, pursuant to which an agent acquires greater duties to the customer, when

> (1) the agent misrepresents the nature or extent of the coverage offered or provided, (2) an ambiguous request is made that requires a clarification, (3) an inquiry is made that may require advice and the agent, though he need not, gives advice that is inaccurate, or (4) the agent assumes an additional duty by either express agreement with or promise to the insured. [*Id.* at 10-11.]

In this case, abundant evidence supported that Musall stepped from the role of order taker into that of insurance advisor. Musall admitted that he was "an expert in insuring truck and auto dealerships" such as Zaremba, and that he "specifically made recommendations to Jim Zaremba as to what he needed . . . in terms of insurance to be fully insured[.]" Musall conceded that Jimmy had requested enough insurance to replace the building, and the "[t]he intent was there" to cover "the cost of replacement of the building." To that end, Musall agreed that Jimmy asked him to perform an "appraisal." Instead, Musall performed a "cost estimate" using the Marshall & Swift computer program, which calculated the replacement cost at just under $525,000. This evidence, supplied by Musall himself, supports that Musall assumed a duty to advise Zaremba

regarding the coverage needed to replace its building, thereby creating a special relationship.

Jimmy explained that his "replacement coverage" discussion with Musall began when Jimmy presented Musall with an insurance quotation from John Deere. According to Jimmy, the Deere quotation characterized the coverage as "guaranteed replacement costs." Jimmy asked Musall to "meet or beat" the Deere coverage, which Musall agreed to do. Jimmy testified that Musall then undertook a "survey" of Zaremba's building, which he witnessed someone accomplish by touring the facility and taking measurements and photos. Musall's correspondence with Harco supports this allegation; the "Input Data Listing" form completed by Musall identifies Musall as having "[s]urveyed" the property on January 9, 2002.

Jimmy recalled asking Musall whether Zaremba was insured for full replacement coverage in the event of a total loss, and that Musall reassured him that full replacement coverage was in place. This evidence buttressed Zaremba's "special relationship" claim by supporting that Musall misrepresented the nature and extent of the coverage. See *Harts*, 461 Mich at 10-11. By making coverage recommendations, misrepresenting the coverage provided in the policy, and assuming the obligation to "appraise" or "survey" the property to calculate its replacement value, Musall established a duty of care quite different from that of an ordinary insurance agent.

Defendants insist that pursuant to *Casey v Auto-Owners Ins Co*, 273 Mich App 388; 729 NW2d 277 (2006), "the Duty to Read trumped whatever subjective hopes the insured might have about different coverage amounts after their initial purchasing decision proved to be inadequate." Defendants' reliance on *Casey* is

misplaced. In *Casey*, this Court rebuffed an insured's argument that the insurer bore an obligation to determine the correct amount of insurance for the dwelling in question. *Casey* explained that even if the insured "reasonably expected that such a duty or guarantee would be imposed by the policy, that expectation cannot overcome the actual terms of the policy." *Id.* at 397.

Notably, the insurance agent in *Casey* neither rendered coverage advice nor misrepresented coverage terms. Rather, *Casey* presented a garden-variety relationship between an insurance agent and his client. This Court specifically noted that "the policy did not impose any duty on Auto-Owners to accurately appraise the property, nor did it include any guarantee that the coverage provided would be adequate to cover any loss that might occur." *Id.* Unlike the plaintiffs in *Casey*, Zaremba enjoyed a special relationship with its insurance agent, Musall, that gave rise to different obligations. Accordingly, we reject the argument that Zaremba's "special relationship" proofs were insufficient to establish Musall's duty to advise with due care.

### C. JUDGMENT NOTWITHSTANDING THE VERDICT BASED ON ATTORNEY MISCONDUCT

Defendants next argue that Michael Wais, Zaremba's attorney, committed misconduct that denied defendants a fair trial. Defendants describe Wais's misconduct as "speaking objections,"[3] "running commentary" on the evidence, repeated accusations that the defense witnesses were "liar[s]," and statements designed to portray the policy as too difficult for a layperson to understand. Wais's goal, defendants urge, was to encourage

---

[3] A "speaking objection" is an objection that contains more information than the judge needs to rule on the objection. Speaking objections are often intended to influence the jury or the witness.

the jury to nullify Zaremba's duty to read the policy. The trial court denied defendants' motion for a new trial on this ground, finding that Wais's conduct "does not rise to the level of irregularity or misconduct under MCR 2.611(A)(1)(a) or MCR 2.611(A)(1)(b) that would justify the granting of a new trial."

We review for an abuse of discretion a trial court's general conduct of a trial. See *In re King*, 186 Mich App 458, 466; 465 NW2d 1 (1990). This standard of review also applies to a court's decision on a motion for a new trial, *McManamon v Redford Charter Twp*, 273 Mich App 131, 138; 730 NW2d 757 (2006), and a court's evidentiary decisions, *Price v Long Realty, Inc*, 199 Mich App 461, 466; 502 NW2d 337 (1993). An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes. *Radeljak v DaimlerChrysler Corp*, 475 Mich 598, 603; 719 NW2d 40 (2006). An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding. *Hunt v Freeman*, 217 Mich App 92, 95; 550 NW2d 817 (1996). "Reversal is required only where the prejudicial statements" reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to "deflect the jury's attention from the issues involved." *Id.*

Defendants correctly observe that Wais engaged in speaking objections, commented occasionally on the evidence, and proposed an incorrect legal theory concerning Zaremba's duty to read its insurance policy. Defense counsel also engaged in speaking objections, commented negatively on the trial court's handling of the case, and vigorously argued a patently incorrect legal theory regarding the admissibility of the Deere

proposal.[4] This was a hard-fought case during which the trial court occasionally lost control of the attorneys, and the attorneys frequently ignored the trial court's repeated admonitions to behave themselves. Despite the breaches of professional conduct norms revealed in the trial transcript, we perceive no "studied purpose to prejudice the jury" or to divert the jury's attention from the merits of the case. *Kern v St Luke's Hosp Ass'n of Saginaw*, 404 Mich 339, 354; 273 NW2d 75 (1978). Nor did the objections, speeches, comments, and arguments qualify as inflammatory, extreme, or deliberately misleading.

Defendants have directed us to a number of places in the transcript where, in defendants' estimation, Wais engaged in improper and prejudicial conduct. Many of the record citations involve argument conducted outside the presence of the jury. We decline to find that arguments made only to the trial court deprived defendants of a fair trial.

We first address defendants' complaint concerning speaking objections. Evidentiary objections that go beyond recitation of the pertinent rule of evidence being invoked risk prejudice. See MRE 103(c) ("In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury."). Both sides engaged in speaking

---

[4] Defense counsel argued that the Deere proposal constituted inadmissible hearsay despite that Zaremba did not propose the document's introduction to prove its truth. Whether the Deere quotation was "true" or "accurate" bore no relevance to the case. Zaremba sought to use it only to corroborate that Jimmy asked Musall to "meet or beat" the specific coverage set forth in the proposal. We mention this evidentiary issue solely to illustrate that counsel may vigorously argue a legally incorrect proposition without depriving the opposing side of a fair trial.

objections. The trial court admonished both counsel to avoid speaking objections. We have reviewed each and every alleged speaking objection identified by defendants and find no comments or arguments rising to the level of professional misconduct, or that likely engendered unfair prejudice. Moreover, the trial court recognized the problem and dealt with it emphatically when denying defendants' motion for a mistrial on this ground:

> *The Court*: Well, I want to make a statement that the first day of trial I had both of you in chambers, and I told you I was not going to tolerate interruptions and rude behavior. And I agree with you, [defense counsel], there ha[ve] been interruptions, and you've been rude. Yeah, it's been way --
>
> *[Defense Counsel]*: I -- I agree with all that. I said that.
>
> *The Court*: It's been way too contentious between the two of you attorneys. Now, I understand that you -- things can get a little bit rough on cross-exam. We had a little bit of [an] emotional situation yesterday, when I -- oh, my gosh, was it John Zaremba was on the stand? And I understand that there is emotion in this case, but it shouldn't be being generated by the attorneys.
>
> I think I can give an instruction to the jury to attempt to cure this, and I appreciate your motion.
>
>        \*   \*   \*
>
> *The Court*: All right. The other rule is you're not to approach the bench. If you want to state an objection, state it from counsel table or the podium. We can't have all this interacting with the Court and the witnesses and so forth.
>
> So I'm -- I'll deny your motion, and does everybody understand the ground rules because I will be sanctioning attorneys if -- if there were -- if there are violations?
>
> *[Counsel]*: (No response)

*The Court*: You do not interrupt the witness. You do not interrupt the attorney. You let them finish their question or their answer. You state simply and precisely the reason for your objection. I'll permit counsel to counter with a response, and then, the Court will rule. And once I rule, that's it.

After admonishing counsel, the trial court instructed the jury as follows:

*The Court*: All right. Members of the jury, I'm going to give you a few instructions again just to clarify something.

As I told you in the beginning, statements by attorneys are not evidence. Questions by attorneys are not evidence. Certainly, what they state in their objections are not evidence. Only the witnesses' answers are evidence if we're talking about a live witness or the exhibits are evidence.

I want you to disregard anything that does not comport with what you've heard coming out of the witness stand or exhibits, any statements made by the attorneys in this matter. I've outlined for them the procedure I want them to follow in the future as far as objection procedure and so forth.

Certainly, my rulings also are not in favor or against any party. You should not consider that as any opinion that I may have as to the facts of this case because you are the sole judges of the facts.

If I were -- If I do sustain an objection to a question for whatever legal reason, I don't want you to speculate on what the answer would have been.

Okay. Does everybody understand all that?

*Jurors*: (Positive response)

*The Court*: Okay. And as far as any statements of the law, you follow the law as I give it to you not as stated by the attorneys. Okay? You can listen to the attorneys as to their understanding of the law, but if it conflicts with -- with what I tell you is the law, you have to follow what I tell you. Okay?

*Jurors*: (Positive response)

*The Court*: All right. You may proceed.

The trial court repeated this instruction at the conclusion of the case:

> As I told you before, the lawyers' statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories. The lawyers' questions to witnesses are also not evidence. You should consider these questions only as they give meaning to the witnesses' answers. You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge.

"Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Given the forceful manner in which the trial court handled the "speaking objection" problem, we find no merit in defendants' claim that speaking objections tainted the jury's ability to fairly decide this case.

Defendants next challenge as misconduct Wais's frequent allegations that defense witnesses "lied" or were "liar[s]." Credibility was very much at stake in this case. Musall denied appraising Zaremba's property, denied that he promised to procure replacement coverage, and recollected several pertinent conversations differently than Jimmy. Throughout Wais's cross-examination of Musall, Wais successfully impeached Musall with trial exhibits and the testimony Musall gave during the first trial. The record confirms that Musall was less than entirely truthful and forthcoming when answering some of Wais's questions. The trial court observed that Musall's testimony had not been wholly consistent and concluded that Wais's comments on Musall's truthfulness did not constitute an unsub-

stantiated attack. The trial court's reasoning was sound and we decline to disturb it.

Defendants' most substantial argument relates to Wais's insistence during the trial that Zaremba's failure to read the policy did not qualify as comparative negligence because the policy was difficult to understand. Wais introduced this theme in his opening statement, without objection:

> And one of the excuses that you're going to hear from the other stuff [sic] is that Jim Zaremba should have read his insurance policy. And I'll tell you why that doesn't get us anywhere anyway later. But for this claim, there's not going to be any -- and the Judge is going to instruct you as to the law. It's either he did it wrong, and if he did, we win, or if he didn't, we lose. If all the defense is about they should have read the insurance polic[y], and I'll get to that again, do not apply to this claim. It's already been ruled upon as a matter of law, and the Judge will tell you that.
>
> So when you're hearing about this stuff about, you know, you should have read the policy, just look at this. *Can't you figure it out?* Look at this other document. *Can't you read that and all the stuff that they're going to try to attack my client with? None of that applies because rightly reading it you wouldn't know that he didn't do it. You can read it all you want, and it doesn't say I lied to you when I told you that I did the appraisal.*
>
> That's why if you find that he did not do the appraisal that he said he would do -- oh, he has a very good excuse for the appraisal. [Emphasis added.]

In *Zaremba I*, we emphasized that Zaremba bore a legal duty to read its policy, and that its failure to do so could qualify as comparative negligence. We also rejected the notion that the stated policy limits "lacked clarity or harbored ambiguity." *Zaremba I*, 280 Mich App at 34 n 8. Our opinion further declared that because the policy language had no bearing on Zarem-

ba's "negligent appraisal" theory of liability, the comparative negligence analysis did not apply to that claim. *Id.* at 35.

To the extent Wais referred to the appraisal theory when calling into question the jury's ability to "figure [the policy] out," he did not run afoul of this Court's ruling. At other times, however, Wais crossed the line. For example, later in his opening statement Wais declared, "This is the insurance policy other than the pictures. It is double-sided. It goes on and on for lots of pages. If you can figure this out, the next time I do a case I may hire you. Because I'll tell you, I couldn't figure it out." On another occasion, Wais told the court (in the jury's presence) that he intended to argue that because Harco's claims adjuster had conceded that the "lawn and garden" portion of the policy was difficult to understand, Zaremba "wasn't comparatively negligent for not reading it because if he would have read it he wouldn't understand it any better[.]" This argument was improper for two reasons. First, the lawn and garden coverage had nothing to do with the issues presented during the second trial. Second, this Court instructed that, with regard to the relevant policy provisions, the policy limits were clearly stated without ambiguity.

Despite his announced intention to argue that the policy was too confusing to be understood by Zaremba, Wais apparently thought better of it by the time of the closing arguments. The only comment that referred to the policy was an accurate and unobjectionable statement: "There's not a single document that if you read it a hundred times, if you hire the smartest brains in the world . . . , nobody could find a single document that says, if you read this, you'll see that you were not fully insured. The

document doesn't exist." Wais refrained from arguing that the policy was generally confusing or overly long. Moreover, Jimmy admitted during cross-examination that defendants had provided the coverage stated in the policy.

At the conclusion of the case the trial court properly instructed the jury:

> Now, as part of Plaintiff's duty, the Plaintiff is obligated to read the insurance policies and raise questions about the coverage within a reasonable time after the policies are issued. If the Plaintiff does not read the policies, he is charged with knowledge of the terms and conditions of the insurance policies.

Although Wais had succeeded in suggesting to the jury that the policy was difficult to understand, the trial court's instructions did not permit the jury to adopt this excuse for failing to read and understand it.

Wais's incursions into improper territory do not warrant a new trial. His comments were isolated, brief, and appear to have played no part in the jury's verdict. Even assuming that Wais deliberately mischaracterized our previous opinion while making arguments to the trial court or questioning witnesses, his comments constituted harmless error.

### D. INCONSISTENT VERDICTS

Next, defendants challenge as "completely [i]nconsistent" the jury's verdict that Zaremba was 30 percent comparatively negligent as to the general negligence count and only 20 percent comparatively negligent with regard to the innocent misrepresentation claim. Defendants contend that these verdicts cannot be logically reconciled except by assigning the higher comparative

negligence finding to the whole verdict. The trial court rejected defendants' objection to the proposed judgment on this ground, reasoning:

> The jury was certainly given two separate causes of action requiring separate proofs. The proofs justified the jury's allocation of fault both for the negligence claim and the innocent misrepresentation claim. While the Court has not been given an appellate case exactly on point, this Court concludes that the jury verdict in this case is not inconsistent and irreconcilable and is supported by the evidence, the jury instructions and the arguments of the parties.

The trial court properly rejected defendants' objection to the proposed judgment based on the differing percentages of comparative negligence assigned to Zaremba's differing theories of liability. By harmonizing the jury's comparative fault verdicts, the trial court abided by the fundamental principle that "[o]nly where verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside[.]" *Granger v Fruehauf Corp*, 429 Mich 1, 9; 412 NW2d 199 (1987). Moreover, the Court Rules do not provide an avenue to a new trial based on an inconsistency or incongruity in the jury's conclusions. *Kelly v Builders Square, Inc*, 465 Mich 29, 39; 632 NW2d 912 (2001).

Zaremba advanced and the jury considered several species of negligence claims. One set of general negligence allegations encompassed whether Musall (a) negligently failed to procure the insurance coverage Zaremba requested and (b) negligently appraised Zaremba's building and contents. A second set of claims, denoted "innocent misrepresentation," concerned whether Musall falsely represented that (a) the coverage stated in the policy was adequate to replace the building and its contents and (b) the Marshall & Swift appraisal constituted a reasonable

assessment of the building's replacement cost. With regard to each of these liability theories, defendants countered with comparative negligence arguments. Concerning Musall's representations and his failure to procure enough coverage, defendants contended that Zaremba should have read its policy. Regarding the appraisal, defendants maintained that Jimmy supplied Musall with incorrect information.

Given these distinct arguments concerning comparative fault, we find no inconsistency in the jury's verdict. The jury reasonably could have concluded that Zaremba bore a higher percentage of comparative fault with regard to the general negligence claims based on Zaremba's failure to read its policy, and a lesser percentage for providing Musall with incorrect information for the appraisal. Because the different percentage findings of comparative negligence can be reconciled, the trial court did not err by declining to recognize only the greater of them when entering judgment on the alternative theories of recovery, or in declining to order a new trial for that reason.

### E. CASE EVALUATION SANCTIONS

Defendants next challenge the trial court's award of case evaluation sanctions in connection with both the original trial and the retrial. Defendants insist that they should be responsible for case evaluation sanctions in connection with the retrial only. We find no error. The trial court followed applicable caselaw by including the first trial in its award of case evaluation sanctions.

MCR 2.403(O)(1) states, "If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation." Before the first trial, a unanimous

case evaluation panel awarded Zaremba $1,200,000, which defendants rejected. The case then proceeded to a verdict. This Court upheld the jury's verdict of $496,185 for breach of contract, $258,554 in penalty interest, and $42,481 for recovery of insurance proceeds. *Zaremba I*, 280 Mich App at 25. On retrial the jury awarded Zaremba an additional $1,556,448, reduced by comparative negligence to $1,245,264.40. Zaremba claimed entitlement to sanctions because defendants rejected the case evaluation. The trial court awarded sanctions in the amount of $67,271.50 in connection with the retrial of the tort claims, and, over defendants' objections, $67,467.83 in connection with the first trial.

In *Severn v Sperry Corp*, 212 Mich App 406, 417; 538 NW2d 50 (1995), this Court held that "fees generated in connection with both trials were 'necessitated by the rejection' of the mediation evaluation because they arose after the rejection," adding, "[t]he cost of two trials was part of the risk assumed by [the rejecting party] when it rejected the mediation evaluation." Defendants concede, "binding precedent is currently against our position," but, citing the conflict rule, MCR 7.215(J), urge this Court to initiate the process for overruling itself. We decline this invitation.

### F. ZAREMBA'S CROSS-APPEAL

Zaremba challenges the jury's verdict in two respects. First, Zaremba argues, the law of the case doctrine precluded the jury from assessing Zaremba's comparative fault related to the innocent misrepresentation claim. Zaremba next contends that even if the jury properly evaluated whether Zaremba bore any comparative fault for Musall's innocent misrepresenta-

tion, the 20 percent reduction applied only to the claim for the building itself, and not its contents.

Zaremba has also misapprehended the law of the case doctrine. Because the facts of the second case differed meaningfully from those of the first, the trial court properly submitted the question of Zaremba's comparative fault for Musall's misrepresentation to the jury. Further, Zaremba failed to preserve its challenge to the application of comparative fault to its building contents claim, and for that reason, we reject it.

Zaremba's argument stems from the following portions of *Zaremba I*:

> [P]laintiff's liability claims arising from Musall's negligent appraisal of its building do not logically lend themselves to a comparative negligence analysis. In addition to plaintiff's insufficient coverage claim, plaintiff contended that Musall negligently calculated the replacement value of its building. Plaintiff's policy and the related documents do not contain, however, any information that might have called into question the accuracy of the Marshall & Swift computation or Musall's allegedly negligent representation that plaintiff could replace its building within the limits of the policy. Thus, under the negligent appraisal theory of liability, plaintiff's own failure to read its insurance documents does not represent a proximate cause of its damages.

> * * *

> . . . [P]laintiff's fraud and innocent misrepresentation claims also encompassed Musall's statements regarding the accuracy of the Marshall & Swift computation and whether plaintiff could actually replace its building for $525,000. Neither the policy language nor any documents provided by defendants regarding the policy would have shed light on the accuracy of the Marshall & Swift estimate or Musall's representation that the $525,000 coverage limit constituted adequate replacement coverage. [*Zaremba I*, 280 Mich App at 35, 40.]

Zaremba asserts that given this language, the law of the case required the trial court to refrain from submitting to the jury the question of Zaremba's comparative fault for Musall's innocent misrepresentation.

"The law of the case doctrine is a general rule that applies only if the facts remain substantially or materially the same." *People v Phillips (After Second Remand)*, 227 Mich App 28, 31-32; 575 NW2d 784 (1997). Unlike in the first trial, evidence presented to the second jury indicated that Jimmy supplied Musall with an incorrect number for the square footage of the building. Musall contended that this erroneous number contributed to his errant calculation of the building's replacement value. This evidence sufficed to support a comparative negligence instruction, and to avoid application of the law of the case doctrine.

While Zaremba objected to submitting the question of comparative fault for any innocent misrepresentation to the jury, Zaremba raised no argument that comparative negligence could not apply to Musall's evaluation of the value of the building contents. Zaremba could have requested a special verdict distinguishing between the damages awarded for the building and those awarded for the contents. It failed to do so. Accordingly, Zaremba has waived any error.

Affirmed.

RONAYNE KRAUSE, P.J., and GLEICHER and BOONSTRA, JJ., concurred.