*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOSHUA MARK BURGER,

Defendant-Appellant.

FOR PUBLICATION
February 25, 2020
9:05 a.m.

No. 343332
Wayne Circuit Court
LC No. 17-005741-01-FH

Before: SHAPIRO, P.J., and JANSEN and M. J. KELLY, JJ.

JANSEN, J.

Defendant appeals as of right his conviction of arson of insured real property, MCL 750.76(1)(b). Defendant was sentenced to 15 months to 20 years' imprisonment. We reverse, vacate defendant's conviction and sentence, and remand for a new trial.

## I. RELEVANT FACTUAL BACKGROUND

This case arises out of a fire that occurred on April 12, 2017, at defendant's pawn shop, for which defendant made an insurance claim. Defendant, together with his father, Christian Whitt, co-owned the pawn shop called Pawn Max, or Southgate Exchange Incorporated. The pawn shop was purchased in 2012 for $125,000 on a five-year-land contract, and was paid off within six months.

At trial, Whitt testified that the rent, utilities, payroll, and taxes were current. In 2016, the pawn shop had turned a profit of $427,000. As of April 12, 2017, the pawn shop had turned $126,000 in profit, and was on track to make more than $500,000. Whitt further testified that defendant had no financial problems, had a credit score of above 790, and believed financial stability was important.

On the day of the fire, defendant had been staining a guitar with linseed oil on a rag. Defendant was storing the project on a plywood shelf in the pawn shop's storage room. At 7:23 p.m., security cameras showed defendant leaving the storage room for 10 seconds, then returning. Defendant stayed in the storage room until 7:27:39 p.m. before walking out of the room alone and

-1-

locking the door. At 7:27:55 p.m., a fire could be seen in the storage room. Defendant turned off the lights in the pawn shop office, set the alarm, and left the building at 7:28:13 p.m.

Justin Graves, a Southgate firefighter, testified that he was one of the first firefighters to respond to the fire at the pawn shop on the evening of April 12, 2017. After being alerted by the alarm company that there was a fire, defendant returned to the pawn shop and unlocked the building for first responders. Graves and another firefighter came to a locked door inside the building and forced entry into that room, which was a storage area fully on fire "from floor to ceiling." Graves stated that it "took a few more seconds of water" than usual to dampen the fire, which struck him as odd because fires typically dampen immediately once sprayed with water, although the fire was still extinguished relatively quickly. Graves testified that another room separated from the main sales area by a wall was also on fire. Another firefighter extinguished that fire, and Graves confirmed that the fire had not spread elsewhere.

The fire was investigated by Southgate Fire Chief Michael Sypula, Wyandotte Fire Chief Jeffrey Carley, and Richard Kobarsky, a forensic engineer and owner of a forensic engineering firm called Pyrotechnical Investigations who was called by the defense and qualified as an expert in the field of fire investigation, testified that he investigated the fire on May 31, 2017.

Chief Carley testified at trial that three wooden shelves in the storage room had significant charring and that the second of the three shelves in the storage room was the point of origin of the fire. Chief Carley was able to identify this shelf as the point of origin because the charring of the higher shelves and the ceiling was consistent with the fire moving "up and out," as fires typically do, while some equipment stored below the shelf that was the point of origin was "relatively undamaged." Chief Sypula also identified the shelf in the storage area as the point of origin because of the "burn pattern," or the amount of charring.

Chief Sypula stated that he ultimately determined that the cause of the fire was not electrical, mechanical, or natural. Chief Carley also stated that he did not discover a mechanical or electrical source of fire and that he ruled-out natural causes, such as lightning. Chief Carley testified that he concluded that the "fire was incendiary," meaning that it had been set intentionally and was not caused accidentally, because there were no mechanical or electrical explanations for why the fire began. Chief Sypula testified that in addition to ruling-out electrical, mechanical, and natural causes of the fire, he relied on the firefighters' statements that there were two separate fires and the security camera footage showing defendant in the storage area 60 to 90 seconds before the fire started to conclude that the fire was incendiary. Chief Sypula also relied on video footage showing defendant "repositioning a camera" inside the storage room earlier that day and defendant putting rubber gloves on at 7:20 p.m. Chief Sypula did not find what actually started the fire.

Kovarsky also concluded that the fire had one point of origin: the storage room. Indeed, relying on photographs from the scene, Kovarsky testified that he believed a shelf in the storage room was the point of origin. On or near the shelf were a guitar, a "metal paint container" without a label that Kovarsky was led to believe contained linseed oil, and some "fairly undamaged rags . . . at the top of the container." Kovarsky learned from defendant that he had been using linseed oil to refinish a guitar and had been placing the used rags in a metal can. Kovarsky stated that something else must have been on top of the rags because the cleanliness of the rags was

inconsistent with the heat damage to the outside of the paint can. Kovarsky testified that the cause of the fire in this case was uncertain, but spontaneous combustion was his primary theory.

Christina Swan, "a technical specialist" who "handle[d] first[-]party property claims" for Northfield Insurance, a subsidiary of Travelers Insurance, testified that defendant filed a claim related to the April 12, 2017 fire on April 27, 2017, in the amount of $574,954.68. Defendant's insurance policy included coverage for fire damage, but a claim would not be paid if defendant were found to be responsible for the damage. Swan stated that defendant submitted the claim on behalf of Southgate Exchange Incorporated and listed himself as the sole owner with no third-party beneficiaries. Defendant listed the cause of the fire on the insurance claim as "unknown."

Ultimately, defendant was convicted by a jury of arson of insured real property with intent to defraud. The trial court sentenced defendant to 15 months to 20 years' imprisonment. This appeal followed.

## II. EXCLUSION OF DEFENSE WITNESSES

Defendant first argues on appeal that the trial court erroneously excluded the testimony of two defense witnesses. We agree.

## A. STANDARD OF REVIEW

"A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion." *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017), citing *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018), quoting *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted). "A trial court also necessarily abuses its discretion when it makes an error of law." *People v Al-Shara*, 311 Mich App 560, 566; 876 NW2d 826 (2015).

## B. ANALYSIS

Defendant sought to admit the testimony of senior public insurance adjuster Craig Becker at trial.[1] Defendant sought to have Becker qualified as an expert in "first[-]party property insurance" and expected Becker to testify about defendant's insurance coverage. The prosecution objected to the introduction of Becker's testimony under MCL 500.1232, which provides, in relevant part:

> A person shall not audit or abstract policies of insurance or annuities, provide advice, counsel, or opinion with respect to benefits promised, coverage afforded, terms, value, effect, advantages, or disadvantages of a policy of insurance or

---

[1]Like insurance counselors, all insurance adjusters, with few exceptions, are required to be licensed in the State of Michigan. MCL 500.1222(1). However, an insurance counselor and an insurance adjuster serve separate and distinct purposes. See MCL 500.100 *et seq.*

annuity, nor advertise, solicit business, or hold himself or herself out to the public as an insurance counselor unless he or she is licensed as an insurance counselor. . . . This section does not prohibit the customary advice offered by a licensed insurance agent nor does this section apply to a person admitted to the practice of law in this state. [Emphasis added.]

Defendant countered, arguing that Becker's testimony was admissible under MRE 702, which provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Defendant proffered that Becker would be qualified to testify regarding his review of defendant's insurance policy, the pawn shop's finances, and the inventory supporting defendant's insurance claim. The trial court agreed with the prosecution, and excluded Becker's testimony on the basis of MCL 500.1232, noting that Becker was not "a licensed insurance counselor," and therefore was precluded from "giv[ing] an opinion with respect to benefits, promised coverage afforded, terms, value, effect, advantages or disadvantages."

"The primary goal of statutory interpretation is to give effect to the intent of the Legislature. The objective of statutory interpretation is to discern the intent of the Legislature from the plain language of the statute." *People v Barrera*, 278 Mich App 730, 735-736; 752 NW2d 485 (2008). When the language of the statute is clear and unambiguous, the Court applies that language without further judicial construction. *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008). "[S]ound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words*, not from its silence." *Id*. at 58-59 (quotation marks and citation omitted). Statutory provisions should be read "as a whole, focusing on not only the individual words and phrases but also the placement of those words and phrases in the context of the broader legislative scheme." *People v Watkins*, 491 Mich 451, 468; 818 NW2d 296 (2012). The Court may look beyond the language of the statute to determine legislative intent only when the language of the statute is ambiguous. *People v Schumacher*, 276 Mich App 165, 168; 740 NW2d 534 (2007). "A statutory provision is ambiguous only if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning." *People v Savage*, 327 Mich App 604, 618; 935 NW2d 69 (2019) (quotation marks and citation omitted).

Quoted in relevant part *supra*, MCL 500.1232 reflects a longstanding distinction "between insurance agents and insurance counselors, with agents being essentially order takers while it is insurance counselors who function primarily as advisors." *Harts v Farmers Ins Exch*, 461 Mich 1, 9; 597 NW2d 47 (1999). Because of this difference, insurance agents generally have no duty to advise a potential customer about coverage. *Id*. at 8-9. Such a duty may arise if a special relationship arises between the insurance agent and the customer. *Id*. at 9-10. This Court has applied this test to determine the bounds of an insurance agent's duty to advise a prospective

-4-

insured. For example, in *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 13-14; 837 NW2d 686 (2013), this Court concluded that an insurance agent had a duty to provide the customer with advice about coverage because the agent calculated the replacement cost of the customer's building. In these cases, MCL 500.1232 applied to an insurance agent's relationship with a customer in the context of buying and selling insurance, and whether the liability landed with the insurance agent if a client was underinsured after relying on the agent's advice.

Indeed, Michigan jurisprudence has yet to address whether MCL 500.1232 bars a witness from testifying about the terms of an insurance policy when the witness is not a licensed insurance counselor. We now take the opportunity to do so, and conclude that MCL 500.1232 does not bar an expert witness, whose testimony is otherwise admissible under MRE 702, from providing testimony regarding the terms of an insurance policy. In this case, MCL 500.1232 did not bar the admission of Becker's testimony, and the trial court's conclusion to the contrary was an abuse of discretion, as it was an error of law. *Al-Shara*, 311 Mich App at 566.

MCL 500.1232 and MRE 702 are not in conflict. MCL 500.1232 does not contain any reference to the admissibility of evidence in a court proceeding. Indeed, the entirety of Chapter 12 of The Insurance Code of 1956, MCL 500.100 *et seq.* pertains to the licensing requirements, and serves as a licensing framework, for agents, solicitors, adjusters, and counselors. MCL 500.1232, the statute at issue here, prohibits anyone who is not a licensed insurance counselor from "aduit[ing] or abstract[ing] policies of insurance or annuities, provid[ing] advice, counsel, or opinion with respect to benefits promised, coverage afforded, terms, value, effect, advantages, or disadvantages of a policy of insurance or annuity, [or] advertis[ing], solicit[ing] business, or hold[ing] himself or herself out to the public as an insurance counselor." Moreover, a person who is not licensed as an insurance counselor is also prohibited from "us[ing] terms such as consultant, consulting services, or any other language in a way which implies that he or she is a licensed insurance counselor." MCL 500.1232.

In this case, the insurance policy defendant sought to recover under was purchased in February 2017. The purpose of Becker's testimony was to describe the coverage provided and the losses incurred. Becker would not have been acting as an insurance counselor by providing an expert witness opinion about the already existing insurance coverage, and the losses incurred. Indeed, Becker's testimony is typical of a public insurance adjuster, which Becker is. In sum, MCL 500.1232 prohibits an individual not licensed as an insurance counselor from doing the work of an insurance counselor, i.e., advise clients about what type of insurance coverage they will need. None of the statutory licensing provisions refer to providing testimony in court, thus MRE 702 applies. The trial court committed a legal error by exceeding the scope of MCL 500.1232 by applying it to bar the testimony of a public adjuster regarding the terms of coverage of an already purchased insurance policy.

We also conclude that "'after an examination of the entire cause, it . . . affirmatively appear[s]' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999), quoting MCL 769.26. The trial court's exclusion of Becker's testimony deprived defendant of the ability to fully mount the defense that he had no financial motive to defraud the insurance company or set the building on fire. Because defendant should have the opportunity to fully present a defense, we vacate his conviction and sentence, and remand for a new trial.

Defendant also argues that the trial court committed legal error by excluding the testimony of his landlord and owner of the building, Diane Desantis. Desantis' testimony was offered to show that defendant was current on his rent, and thus further his theory that he had no financial motive to commit an arson.

Relevant evidence is generally admissible. MRE 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is not of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. Financial motive may be relevant evidence of arson. *People v Carter*, 250 Mich App 510, 521; 655 NW2d 236 (2002).

Where financial motive may be relevant of arson, *id.*, it logically follows that a lack of financial motive is also relevant to whether a defendant committed arson. Thus, Desantis' testimony was relevant, and should have been admitted. Defendant should have the opportunity to fully pursue his defense on remand.

## III. BRADY VIOLATION

Defendant also argues that the prosecution violated *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by failing to disclose the fire chiefs' amended conclusions regarding the fire until the start of trial. Although we agree that a *Brady* violation occurred, we cannot conclude that defendant is entitled to relief.

### A. STANDARD OF REVIEW

Defendant failed to preserve his claim that the prosecution improperly suppressed evidence by moving in the trial court for a new trial, or for relief from judgment. *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005). Although this Court generally reviews de novo constitutional claims, such as an asserted *Brady* violation, *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016), we review unpreserved claims for plain error. *People v Dickinson*, 321 Mich App 1, 15; 909 NW2d 24 (2017). To establish plain error, the defendant must establish that "(1) an error occurred, (2) the error was 'plain'—i.e., clear or obvious, and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected." *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (quotation marks and citation omitted).

### B. ANALYSIS

The United States Supreme Court held in *Brady*, 373 US at 87, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a *Brady* violation, a defendant must establish that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material."

*People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). In *Chanault*, our Supreme Court explained these elements in further detail:

> The government is held responsible for evidence within its control, even evidence unknown to the prosecution, *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995), without regard to the prosecution's good or bad faith, *United States v Agurs*, 427 US 97, 100; 96 S Ct 2392; 49 L Ed 2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). Evidence is favorable to the defense when it is either exculpatory or impeaching. *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]."), quoting *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 US at 434. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id*. at 436. [*Id*. at 150-151.]

Defendant's argument presumes that the disclosure of the fire chiefs' change in opinion for the first time at trial amounts to a *Brady* violation. Defendant's presumption is correct. Generally, a criminal defendant does not have a constitutional right to discovery. *People v Bosca*, 310 Mich App 1, 27; 871 NW2d 307 (2015). However, "a defendant's right to due process may be violated by the prosecution's failure to produce exculpatory evidence in its possession." *Id*. It is undisputed in this case that defendant learned for the first time at trial that the fire chiefs had changed their opinion regarding the fire's point of origin. In their original reports, which were disclosed to defendant, both chiefs opined that the fire had two points of origin. However, the chiefs later altered their conclusions, indicating that indeed, the fire had a single point of origin. We conclude that this information was suppressed, as it was not disclosed until the beginning of trial, and that it was material to defendant's case.

The change in the chiefs' opinion was not necessarily exculpatory, as it did not change the ultimate conclusion that the fire was incendiary. However, it was favorable to defendant because it was consistent with Kovarsky's testimony, and because it provided a basis to impeach the fire chiefs' testimony. Chief Sypula and Chief Carley testified on direct examination that they previously believed the fire had two points of origin and had since changed their opinions. Chief Sypula further testified on direct examination that he changed his opinion after he had seen the evidence report showing no ignitable liquids on the evidence collected from the office, but he had not amended his written report. Defendant confronted Chief Sypula with his report and his

preliminary examination testimony that he testified about two points of origin, and Chief Sypula again admitted that he had not amended his report after changing his opinion prior to trial. Defendant likewise confronted Chief Carley with his report stating that the fire had two points of origin and his failure to provide an amended report when he changed his initial opinion in preparing for trial. Although the prosecution elicited testimony about this change of opinion first, defendant emphasized on cross-examination that Chief Sypula and Chief Carley changed their opinions about the number of points of origin before trial without notifying defendant, and this change of opinion before trial was favorable to defendant because it allowed him to undermine the reliability of their testimony.

Although the evidence suppressed by the prosecution was favorable to defendant, and material to the case, defendant has not shown that he is entitled to relief on his *Brady* violation claim still because defendant has not shown that earlier disclosure would not have affected the outcome of trial. *Cain*, 498 Mich at 116. As discussed, defendant was still able to effectively cross-examine Chief Sypula and Chief Carley regarding their change of opinion and prior inconsistent statements. Additionally, defendant was able to present Kovarsky's testimony, which concluded that the chiefs' reports were deficient, citing as an example their failure to include a description of the wall that was one foot lower than the ceiling, which affected the progression of the fire and the conclusion about the point of origin. Defendant cross-examined Chief Carley about this missing detail about the shorter wall after Chief Carley agreed that details about building construction were important. Kovarsky further testified about his disagreement with the fire chiefs' initial opinion that the fire had two sources of origin. Although the prosecution elicited testimony from Chief Sypula and Chief Carley about the change of testimony on direct examination, their change of opinion and their revelation of that change for the first time at trial could be perceived as ineptitude, as defendant argued in closing.

Moreover, defendant's primary theory of the case was spontaneous combustion of the rag soaked with linseed oil that he had been using to finish a guitar in the days leading up to the fire, as he argued in closing. One of defendant's employees testified about defendant using linseed oil on a rag to finish a guitar the day of the fire and for about five days preceding the fire. Kovarsky testified about rags and a metal paint container found on a shelf in the storage area believed to be the point of origin and his belief that the fire started as a result of spontaneous combustion. Indeed, defendant's spontaneous combustion theory was consistent with the fire chiefs' amended opinion that the single point of origin was a shelf in the storage room. Regardless, defendant has not shown that the prosecution's late disclosure of the fire chiefs' change of opinion would have likely affected the outcome of the trial.

We reverse, vacate defendant's conviction and sentence, and remand for a new trial. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Douglas B. Shapiro
/s/ Michael J. Kelly

-8-