# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

JOHN DOE, as Next Friend of JANE DOE,[1]

      Plaintiff-Appellee,

v

JOHN DOE I, TIMOTHY O'CONNELL, HENRY
FORD HEALTH SYSTEM, INC., and HENRY
FORD HOSPITAL,

      Defendants,

and

SUPERIOR AMBULANCE SERVICE, INC.,

      Defendant-Appellant.

UNPUBLISHED
December 4, 2014

Nos. 307420, 310019
Wayne Circuit Court
LC No. 07-701308-NO

---

Before: METER, P.J., and JANSEN and WILDER, JJ.

PER CURIAM.

     This case involves two consolidated appeals from the same lower court file. In Docket No. 307420, defendant Superior Ambulance Service, Inc. (Superior) appeals as of right from a judgment for plaintiff, John Doe (as next friend of Jane Doe), following a jury trial. In Docket No. 310019, Superior appeals as of right from an order awarding plaintiff taxable costs following an award of attorney fees as case-evaluation sanctions. This Court consolidated the appeals to advance the efficient administration of the appellate process. *Doe v Doe I*, unpublished order of the Court of Appeals, entered May 9, 2012 (Docket Nos. 307420, 310019). We affirm.

---

[1] Although Jane Doe was a minor at the time of the underlying events in this case, she is no longer a minor. See *Doe v Doe I*, unpublished opinion per curiam of the Court of Appeals, issued September 17, 2009 (Docket No. 285655), pp 1-2 (noting that Jane Doe was 14 years old at the time of the sexual assault in 2006), vacated in part and remanded 486 Mich 851 (2010). However, her father, John Doe, continues to be listed as her next friend on the caption.

-1-

This case arises from a Superior ambulance attendant's sexual assault of Jane Doe in the back of a Superior ambulance. The attendant, Matt DeFillippo (John Doe I), sexually assaulted Jane Doe, a 14-year old girl who had cut her hands and wrists, while she was being transported by ambulance from Henry Ford Hospital to a psychiatric hospital located approximately 60 miles away. The other ambulance attendant, defendant Timothy O'Connell, drove the ambulance and observed suspicious behavior that caused him to think or suspect that DeFillippo was sexually assaulting Jane Doe. O'Connell saw that DeFillippo had turned off the interior lights in the ambulance and was in close proximity to Jane Doe for an extended period of time, with his hand in the area of her groin. O'Connell did not call the police or stop the ambulance, but he contacted his supervisor, Jamie Jose, who instructed O'Connell to turn on the lights and tell DeFillippo to move to the "jump seat," further away from Jane Doe. O'Connell told DeFillippo to turn on the lights and move to the jump seat, and DeFillippo briefly complied but then turned off the lights again and moved back to the bench seat next to Jane Doe. O'Connell then told DeFillippo to turn on the lights again and move back to the jump seat, which he did. DeFillippo eventually pleaded guilty to third-degree criminal sexual conduct and was incarcerated when this litigation began. Plaintiff commenced this action alleging various theories of negligence against Superior and O'Connell related to the incident. A jury apportioned 30 percent fault to Superior, zero percent fault to O'Connell, and 70 percent fault to DeFillippo as a nonparty at fault.

## I. DOCKET NO. 307420

Superior first argues that the trial court erred in denying Superior's motion for a judgment notwithstanding the verdict (JNOV) and that the trial court failed to follow the law of the case. We disagree. We review de novo a trial court's decision regarding a motion for a JNOV. *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009). This Court views the evidence and legitimate inferences arising therefrom in the light most favorable to the nonmoving party to determine whether the moving party was entitled to judgment as a matter of law. *Id*. "The motion should be granted only when there is insufficient evidence presented to create a triable issue for the jury. When reasonable jurors could honestly reach different conclusions regarding the evidence, the jury verdict must stand." *Id*. (citation omitted). Whether the law-of-the-case doctrine applies is a question of law that this Court reviews de novo. *KBD & Assoc, Inc v Great Lakes Foam Technologies*, *Inc*, 295 Mich App 666, 679; 816 NW2d 464 (2012).

"The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue." *Id*. "However, the law-of-the-case doctrine only applies to issues actually decided—implicitly or explicitly—on appeal." *Kasben v Hoffman*, 278 Mich App 466, 470; 751 NW2d 520 (2008).

> The law of the case doctrine's rationale is to maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit; the doctrine does not limit an appellate court's power but, rather, is a discretionary rule of practice. A trial court fails to follow the law of the case when it revisits a matter on which this Court has already ruled. [*Schumacher v Dep't of Natural Resources*, 275 Mich App 121, 128; 737 NW2d 782 (2007) (citation omitted).]

Here, the trial court did not fail to follow the law of the case. In a prior, interlocutory appeal in this case, this Court held that "[b]ecause a genuine issue of material fact exists regarding whether O'Connell was negligent in failing to protect Jane Doe there is also a genuine issue of material fact regarding whether Superior could be liable for O'Connell's conduct as his employer under the respondeat superior theory." *Doe v Doe I*, unpublished opinion per curiam of the Court of Appeals, issued September 17, 2009 (Docket No. 285655), p 6, vacated in part and remanded 486 Mich 851 (2010). Thus, this Court held, the trial court properly denied defendants' motion for summary disposition on that claim. *Id*. This Court then stated:

> Superior and O'Connell also maintain that the trial court erred when it denied their motion to dismiss plaintiff's negligent hiring and training allegations against Superior. On appeal, the parties fail to address this claim specifically with regard to O'Connell. As such, we deem the issue with regard to this defendant is waived. [*Id*. at 6-7.]

Next, this Court held that "Superior had no duty with respect to hiring DeFillippo or training others to prevent his engaging in a future sexual assault, because there has been no demonstration that such conduct was foreseeable when he was hired." *Id*. at 7. Hence, this Court held that Superior was entitled to summary disposition regarding the claim that it was negligent in hiring and training DeFillippo. *Id*.

As relevant to this appeal, then, this Court in the prior opinion held that (1) any issue regarding plaintiff's negligent hiring and training allegations against Superior with respect to O'Connell had been waived because it was not argued on appeal, and (2) Superior was entitled to summary disposition regarding the claim that it was negligent in hiring and training DeFillippo, given that DeFillippo's sexual assault was not foreseeable. This Court also stated that Superior had no duty to train other employees to prevent DeFillippo from engaging in a future sexual assault.

On remand, the trial court did not submit to the jury any claims on which this Court held that Superior was entitled to summary disposition. The trial court instructed the jury regarding Superior and O'Connell's duty to protect plaintiff if they had a special relationship with her. The court further instructed the jury to decide whether Superior was negligent in failing to adequately supervise and train O'Connell. Given this Court's holding that any negligent hiring and training allegations regarding O'Connell had been waived, this Court's prior opinion did not preclude submitting to the jury the negligent training claim with respect to O'Connell. Although this Court stated that Superior had no duty to train other employees to prevent a future sexual assault by DeFillippo, this did not preclude a negligent training claim with respect to other matters, such as training employees more generally in how to react to inappropriate conduct by an unspecified employee on an ambulance. It also did not preclude a negligent supervision claim with respect to an ongoing sexual assault of which the employee's supervisor had notice. O'Connell contacted his supervisor, Jose, while the sexual assault was occurring; thus, this case does not concern merely a *future* sexual assault that was unforeseeable but an *ongoing* assault of Jane Doe

-3-

by DeFillippo that O'Connell discussed with Jose during the ambulance transport.[2]  Further, this Court's prior opinion did not bar the claim that Superior failed to adequately protect Jane Doe if it had a special relationship with her.[3]  Accordingly, the trial court on remand did not fail to follow the law of the case.

Superior further argues that the jury's apportionment of zero percent fault to O'Connell requires entry of a judgment of no cause of action in favor of Superior.  We disagree.  Even an arguably inconsistent jury verdict must be upheld if "there is an interpretation of the evidence that provides a logical explanation for the findings of the jury. [E]very attempt must be made to harmonize a jury's verdicts.  Only where verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside."  *Allard v State Farm Ins Co*, 271 Mich App 394, 407; 722 NW2d 268 (2006) (quotation marks and citations omitted).  Here, the fact that the jury apportioned no fault to O'Connell did not preclude a finding that Superior was negligent.  Plaintiff's claims against Superior were not restricted to vicarious liability for O'Connell's alleged negligence; rather, plaintiff claimed that Superior itself was *directly* negligent for failing to adequately protect Jane Doe and for failing to adequately supervise and train O'Connell.  The jury's apportionment of zero percent fault to O'Connell was not inconsistent with a determination that Superior itself was negligent under a claimed theory of direct liability.

As discussed, there was evidence that O'Connell informed his supervisor, Jose, during the transport that he thought or suspected that DeFillippo was sexually assaulting Jane Doe.  The jury may have determined that Jose should have instructed O'Connell to take more aggressive action to protect Jane Doe, such as by stopping the ambulance or calling the police, or that Jose himself should have called the police or attempted to communicate directly with DeFillippo, once informed of the suspected ongoing assault.[4]  Accordingly, the jury's apportionment of zero percent fault to O'Connell does not require granting a JNOV to Superior.

---

[2] O'Connell acknowledged at trial that he informed Jose during the transport that he thought or suspected that DeFillippo was "fingering" Jane Doe.

[3] The court's final instructions to the jury did not include a claim regarding Superior's failure to supervise DeFillippo.  However, during its preliminary instructions, the court stated:  "Superior is also being sued for failing to supervise its employees, both O'Connell and the assailant Matt DeFillippo, and for failing to train O'Connell."  This preliminary instruction was not barred by the law of the case.  This Court's prior opinion held that Superior was entitled to summary disposition regarding the claim that Superior was negligent in hiring and training DeFillippo, but it did not address a negligent supervision claim.  *Doe*, unpub op at 7.

[4] Superior asserts that plaintiff's apparent filing of a separate lawsuit against Jose one day before trial in this case somehow constituted a judicial admission that precluded holding Superior liable under any of the asserted theories.  Superior fails to cite authority establishing that a defendant cannot be held liable merely because a separate lawsuit was filed against an employee of the defendant and fails to develop the argument adequately to make appellate review possible.  As such, the argument is deemed abandoned. *State Treasurer v Sprague*, 284 Mich App 235, 243; 772 NW2d 452 (2009).  Also, we find unavailing Superior's reliance on *Cox v Flint Bd of Hosp*

Next, Superior argues that the trial court erred in instructing the jury regarding plaintiff's claims. We disagree. "Claims of instructional error are reviewed de novo, but the determination whether an instruction is accurate and applicable is reviewed for an abuse of discretion." *Freed v Salas*, 286 Mich App 300, 327; 780 NW2d 844 (2009) (citation omitted).

Jury instructions are considered "as a whole to determine whether they adequately present the theories of the parties and the applicable law." *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 626-627; 792 NW2d 344 (2010). "On appeal, jury instructions are reviewed in their entirety, rather than extracted piecemeal to establish error in isolated portions." *Mull v Equitable Life Assurance Society of the United States*, 196 Mich App 411, 423; 493 NW2d 447 (1992), aff'd 444 Mich 508 (1994). Also, "[a] verdict should not be set aside unless failure to do so would be inconsistent with substantial justice. Reversal is not warranted when an instructional error does not affect the outcome of the trial." *Alpha Capital Mgt, Inc*, 287 Mich App at 627 (quotations marks and citation omitted).

The trial court instructed the jury as follows regarding plaintiff's claims:

Now I am going [to] give you definitions of some important legal terms. Listen carefully of course, so that you will understand the terms as they are use[d].

Now negligence of an adult, definition. Negligence is the failure to use ordinary care. Ordinary care means the care a reasonably careful person would use. Therefore, by negligence I mean the failure to do something that a reasonably careful person would do, or the doing of something that a reasonably careful person would not do under the circumstances that you find existed in this case.

The law does not say what a reasonably careful person and/or a business or a corporation using ordinary care would or would not do under such circumstances. That is for you to decide.

It was the duty of the defendant in connection with this occurrence to use ordinary care for the safety of plaintiff.

Now, special relationship and duty to protect. A special relationship exists when a party is entrusted to the control and protection of another.

When a special relationship exists, the law imposes upon the parties in control an obligation to protect, because they are in the best position to provide

---

*Managers*, 467 Mich 1, 12; 651 NW2d 356 (2002), for the assertion that plaintiff's complaint against Superior was required to name Jose as a negligent employee; *Cox* was decided on the basis of *medical malpractice* law requiring a determination of the particular standard of care applicable to each hospital employee's profession or specialty, *id*. at 12 n 12, 15, a consideration that does not apply to this ordinary negligence case. As discussed below, we conclude that plaintiff's claims sound in ordinary negligence rather than medical malpractice.

-5-

safety. It is for you to decide whether, under the facts and circumstances of this case, a special relationship existed between plaintiff and defendants.

If you find a special relationship, then I instruct you as a matter of law that defendants had a duty to protect plaintiff from harm.

It is for you to decide whether defendant, Superior Ambulance, was negligent in failing to adequately supervise its employee, Timothy O'Connell.

It is for you to decide whether defendant, Superior Ambulance, was negligent in failing to adequately train its employee, Timothy O'Connell.

Superior contends that the trial court's instruction effectively imposed strict liability by stating that Superior and O'Connell owed a duty to protect Jane Doe if a special relationship existed. We disagree. The trial court's instruction adequately presented the applicable law. "To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Hampton v Waste Mgt of Mich, Inc*, 236 Mich App 598, 602; 601 NW2d 172 (1999). "It is a basic principle of negligence law that, as a general rule, there is no duty that obligates one person to aid or protect another. However, our common law imposes a duty of care when a special relationship exists." *Bailey v Schaaf*, 494 Mich 595, 604; 835 NW2d 413 (2013) (quotation marks and citation omitted).

The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety. [*Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499; 418 NW2d 381 (1988) (citation omitted).]

The trial court's instruction accurately described these legal principles. The court explained that "[a] special relationship exists when a party is entrusted to the control and protection of another." The court further noted that "[w]hen a special relationship exists, the law imposes upon the parties in control an obligation to protect, because they are in the best position to provide safety." Consistent with the holding in *Williams*, 429 Mich at 499, the trial court instructed the jury that if it found a special relationship, then as a matter of law "defendants had a duty to protect plaintiff from harm." The court's instruction conformed to the legal principles discussed in *Bailey* and *Williams*.

Superior's appellate argument implicitly conflates the elements of duty and breach of duty. As discussed above, these are separate elements. *Hampton*, 236 Mich App at 602. Once a duty is found to exist, the factfinder then determines whether, in light of the particular facts of the case, the duty was breached. *Bailey*, 494 Mich at 603. The court here told the jury, in conformance with *Williams*, that a *duty* to protect was owed if a special relationship existed; the court did *not* tell the jury that it must find a *breach* of that duty in light of the particular facts of this case. The court had already expressly instructed that it was for the jury to decide "what a reasonably careful person and/or a business or a corporation using ordinary care would or would

not do under" the circumstances that the jury found to exist in this case. Considered as a whole, the court's instructions were proper.

Superior further contends that the "special relationship" instruction imposed strict liability because plaintiff's counsel argued to the jury that defendants had "the highest duty" or "an absolute duty" to protect Jane Doe or prevent the rape. However, the trial court instructed the jury that "[t]he law you are to apply is contained in these instructions and it is your duty to follow them. In other words, you must take the law as I give it to you." This instruction made clear that the jurors were obligated to apply the legal principles contained in the court's instructions. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 25; 837 NW2d 686 (2013) (quotation marks and citation omitted). The trial court properly instructed the jury regarding the legal duty that arises from the existence of a special relationship.

Superior also argues that the trial court improperly instructed the jury that Superior could be liable for failing to train or supervise O'Connell or for failing to supervise DeFillippo.[5] Superior's argument on this point is repetitive of its contentions discussed above. As discussed, contrary to Superior's argument, this Court's prior opinion did not foreclose submission of such theories to the jury. This Court in the prior opinion held that any argument regarding a negligent training claim with respect to O'Connell had been waived; thus, nothing in this Court's prior opinion precluded submission of such a claim to the jury. *Doe*, unpub op at 6-7. Further, this Court did not preclude a negligent supervision claim; as discussed, there was evidence of an ongoing sexual assault of which the employees' supervisor had notice while the assault was occurring. The trial court adequately presented the parties' theories and the applicable law. Accordingly, Superior has failed to establish an instructional error requiring reversal.

Next, Superior argues that the trial court abused its discretion in denying Superior's motions for a new trial or remittitur. We disagree. Generally, an issue must have been raised before, and addressed and decided by, the trial court to be preserved for appellate review. *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005). Superior raised this issue below when it moved for a new trial or remittitur. The trial court addressed and decided the issue when it denied Superior's motions. This issue is generally preserved. As noted below, however, Superior failed to object with respect to many of plaintiff's counsel's comments that it challenges on appeal, thereby failing to preserve review of those claims. *Thorin v Bloomfield Hills Bd of Ed*, 203 Mich App 692, 704; 513 NW2d 230 (1994). "This Court reviews a trial court's decision regarding a motion for remittitur or a new trial for an abuse of discretion. An abuse of discretion occurs when a court chooses an outcome that is outside the range of principled outcomes." *Heaton v Benton Constr Co*, 286 Mich App 528, 538; 780 NW2d 618

---

[5] As quoted above, the court's final instructions to the jury did not include the theory regarding Superior's failure to supervise DeFillippo. However, during its preliminary instructions, the court stated: "Superior is also being sued for failing to supervise its employees, both O'Connell and the assailant Matt DeFillippo, and for failing to train O'Connell."

(2009) (citation omitted). Unpreserved issues are reviewed for plain error affecting substantial rights. *Rivette v Rose-Molina*, 278 Mich App 327, 328; 750 NW2d 603 (2008).

> A new trial may be granted when excessive or inadequate damages apparently influenced by passion or prejudice were awarded or when the verdict was clearly or grossly inadequate or excessive. If, however, the reviewing court determines that the only trial error is the inadequacy or excessiveness of the verdict it may deny a motion for a new trial on the condition that, within 14 days, the nonmoving party consent in writing to the entry of a judgment in the amount determined by the court to be the lowest or highest amount the evidence will support.

> In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented, such as whether the award was influenced by bias or prejudice or whether the award was comparable to those in similar cases. The power of remittitur should be exercised with restraint. If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, it should not be disturbed. [*Shaw v Ecorse*, 283 Mich App 1, 16-17; 770 NW2d 31 (2009) (citations omitted); see also MCR 2.611(A)(1)(c) and (d) and MCR 2.611(E).]

Further, the Michigan Supreme Court has noted that

> [a]n appellate court reviewing a trial court's grant or denial of remittitur must afford due deference to the trial judge since the latter has presided over the whole trial, has personally observed the evidence and witnesses, and has had the unique opportunity to evaluate the jury's reaction to the witnesses and proofs. Accordingly, the trial judge, having experienced the drama of the trial, is in the best position to determine whether the jury's verdict was motivated by such impermissible considerations as passion, bias, or anger. Deference to the trial judge simply reflects the recognition that the trial judge has observed the testimony while the appellate court merely reviews a printed record. [*Palenkas v Beaumont Hosp*, 432 Mich 527, 534; 443 NW2d 354 (1989).]

Additionally,

> [a]nalysis of this issue must start with the principle that the adequacy of the amount of the damages is generally a matter for the jury to decide. Moreover, a verdict should not be set aside merely because the method the jury used to compute damages cannot be determined. This Court must view the evidence in the light most favorable to the nonmoving party. [*Heaton*, 286 Mich App at 538-539 (citations omitted).]

Superior first contends that plaintiff's counsel improperly appealed to the jury's passions and prejudices, which resulted in an excessive noneconomic damages award of $10 million.[6]

> An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding. Reversal is required only where the prejudicial statements reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to deflect the jury's attention from the issues involved. [*Zaremba Equip*, *Inc*, 302 Mich App at 21 (quotation marks and citations omitted).]

Superior emphasizes that plaintiff's counsel in this case was the plaintiff's counsel in *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 754-755, 770-779; 685 NW2d 391 (2004), in which the Michigan Supreme Court determined that an excessive jury verdict resulted from the plaintiff's counsel's pleas for punitive damages, misleading arguments, and prejudice-inviting rhetoric, including comparisons of the plaintiff to survivors of the Holocaust and references to the corporate defendant's German nationality.

Superior asserts that plaintiff's counsel engaged in prejudicial misconduct in numerous respects. First, Superior argues that plaintiff's counsel improperly suggested that Superior itself had assaulted Jane Doe and was continuing to do so, or had been an accessory or enabler of the sexual assault. Before beginning his opening statement, plaintiff's counsel introduced Jane Doe to the jury and then excused her from the courtroom. Plaintiff's counsel then told the jury, "The reason I am sending her out is I am not going to let them do it to her again." Later in his opening statement, plaintiff's counsel stated: "For this to have happened, Superior and O'Connell had to be complicit the facts will show, had to be enablers and had to be accessories." During his closing argument, plaintiff's counsel said, "See they really don't care. They really—what frustrates me and I don't want to it angers me too much, because it will prevent me from doing my job with you is that they continue to do this to a little girl. They continue to do this, this type of abuse, to a little girl." Later in closing argument, plaintiff's counsel stated, "You must award all of it? Why because otherwise, people like Superior Ambulance would victimize people like [Jane Doe] and get away with it, just like they are going to try to victimize her in a case about stopping a rape and have you take away the money." Plaintiff's counsel continued, "How many times can they assault a little girl? How many times? You start this case you keep it going for 5 years you try to prevent her, you depose her in a deposition and ask her questions about the rape when you know what the type of damage it will produce for seven hours, and then you don't want to question her here in front [of] you for fear that you would see what's going on here." During rebuttal closing argument, plaintiff's counsel stated, "They had a duty, an absolute duty to stop this rape from the very beginning. We wouldn't be here. But I told you what they would do, they would do everything, they would continue to assault this child for 5 years."

---

[6] Although the jury awarded $10 million in noneconomic damages, it apportioned 70 percent of the fault to DeFillippo and 30 percent to Superior, making Superior responsible for $3 million of the noneconomic damages.

The repeated contentions that Superior had assaulted or was continuing to assault Jane Doe were hyperbolic, but we cannot discern any basis to conclude that these comments led the jury to award an excessive amount of damages on the basis of prejudice. Superior did not object to these comments at trial, and a curative instruction would have alleviated any prejudice. *Thorin*, 203 Mich App at 704. The comments in context do not suggest that Superior had physically committed a sexual assault; rather, it appears plaintiff's counsel was primarily attempting to suggest that what plaintiff's counsel viewed as Superior's harsh litigation tactics were taking a toll on Jane Doe, in that she was required to endure five years of litigation, a seven-hour deposition, and a lengthy trial. No reason exists to conclude that the jurors understood these comments to mean that Superior literally was committing a sexual assault of Jane Doe and that the jurors' passions or prejudices were provoked to such an extent that they awarded excessive damages on that basis. Moreover, the trial court instructed the jury that sympathy must not influence its decision, that the lawyers' statements, arguments, and questions were not evidence, and that the corporate defendant was entitled to the same fair and unprejudiced treatment as an individual would be. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Zaremba Equip*, *Inc*, 302 Mich App at 25 (quotations marks and citation omitted).

Superior also complains that plaintiff's counsel made numerous comments suggesting that Superior had lied, engaged in a cover-up, or destroyed evidence.[7] "In closing argument, counsel is permitted to draw reasonable inferences from the testimony." *In re Miller*, 182 Mich App 70, 77; 451 NW2d 576 (1990). Here, there was evidence that O'Connell did not tell the receiving hospital about the suspected rape of Jane Doe because he was told by his supervisor to keep the incident quiet, that O'Connell knew an emergency medical services (EMS) run sheet was submitted by DeFillippo to the receiving hospital falsely saying that Jane Doe was "transported without incident" even though she was assaulted during the transport, that Superior officials did not meet with the police to report the rape until two days after it occurred (although Superior's vice-president claimed to have contacted the police on the day of the rape to make an appointment), and that Superior's vice-president claimed that he was told by a police officer to destroy the linens on which the rape occurred, which the police officer denied. Plaintiff's counsel emphasized Superior's failure to obtain copies of text messages or telephone records regarding O'Connell's communications with his former partner and his supervisor during the transport, and noted that O'Connell's statement to police was less detailed than his written statement to Superior two days earlier. We conclude that plaintiff's counsel's comments suggesting that Superior engaged in a cover-up, lied, or destroyed evidence were based on reasonable inferences from the evidence. See, generally, *Zaremba Equip, Inc*, 302 Mich App at 20-28 (finding no misconduct warranting reversal in a hard-fought case where the plaintiff's attorney called the defense witnesses "liar[s]").

Next, Superior argues that plaintiff's counsel improperly analogized DeFillippo to a vicious dog with Superior as the owner. In his opening statement, plaintiff's counsel said:

---

[7] Superior provides numerous record cites but does not quote or discuss in detail all of the purportedly offending comments.

And remember this, about a guy who likes to keep vicious dogs. And that's fine but he doesn't do a very good job keeping those vicious dogs in a safe environment, he let's [sic] the dogs escape. And the dog runs down the street and mauls a little girl, and the owner says, don't blame me, it's the dogs.

No it's not. It's you. It is about your responsibility about preventing the rape. If the dogs escape then it's Superior's fault.

In closing argument, plaintiff's counsel referenced the same analogy:

But I knew that they would—they would do what I told you they would do and I told you that story about the man who kept vicious dogs and they escaped one day and chewed up a little girl. And then the man says, well it is not me it is the dogs. And that's what happened. That's what ultimately will be back on that jury verdict form.

They want you to name the dogs so they don't have to pay.

In context, the comments do not reflect a deliberate attempt to inflame the jury or divert its attention from the issues in the case. Although the analogy to a vicious dog was somewhat flawed given this Court's prior holding that DeFillippo's sexual assault was not foreseeable, *Doe*, unpub op at 7, it appears that plaintiff's counsel was attempting to explain to the jury the notion that a defendant may be held responsible in some circumstances where another person also bears fault. That is, plaintiff's counsel was evidently seeking to show by analogy how the criminal actions of DeFillippo were distinct from the claimed negligence of Superior in failing to properly train or supervise its employees or to protect Jane Doe if a special relationship existed. This was part of plaintiff's counsel's effort to persuade the jury to apportion fault to Superior and O'Connell rather than DeFillippo on the verdict form. Superior did not object below, and a curative instruction would have alleviated any prejudice. *Thorin*, 203 Mich App at 704. We are not convinced that Superior has established that it was deprived of a fair and impartial proceeding where the trial court correctly instructed the jury regarding the applicable law and to follow the court's instructions on the law. *Zaremba Equip*, *Inc*, 302 Mich App at 25.

Next, Superior notes that plaintiff's counsel repeatedly referred to the placement of DeFillippo on the verdict form as a "lawyer trick" to deprive plaintiff of money and argued that the jury should assign zero percent fault to DeFillippo. In his opening statement, plaintiff's counsel said:

In conclusion, I will proof [sic] that this case is not about rape. It is about preventing rape. Because the only defense in this case at the very end of this case is, so that you know, and I will address that, and the facts in this case, the defendants are allowed to put the rapist on the jury verdict form, and have you take her money away and attribute all the fault to the rapist. That is a lawyer trick.

They are a hundred percent, the ambulance company, O'Connell responsible for not stopping this rape.

-11-

The People versus DeFillippo is that case about the rapist. But they are allowed to do that, and they are going to do it here.

Likewise, in closing argument, plaintiff's counsel stated:

What they have is this. They have a legal lawyer trick to say, we're going to name this person who is not in the lawsuit, and then we are going [to] ask the jury, and here's the question using a hundred percent as the total enter the percentage of fault attributable to Superior Ambulance Service, Tim O'Connell, and then here's the trick, DeFillippo.

Now, even though this case has nothing to do with the rape, has only to do with stopping the rape, whatever percentage you put in there, takes away [Jane Doe's] money.

Superior did not object below, and a cautionary instruction would have cured any error. *Thorin*, 203 Mich App at 704. Assuming that the term "lawyer trick" is an inappropriate manner of referencing the placement of a nonparty at fault on the verdict form, there is no evidence that the use of this term inflamed the jury to award excessive damages. Indeed, the verdict itself reflects that that the jury *rejected* plaintiff's counsel's request to award zero percent fault to DeFillippo; instead, the jury awarded 70 percent fault to DeFillippo, 30 percent fault to Superior, and zero percent fault to O'Connell. The record affords no basis from which to conclude that the jury's decision was improperly influenced by plaintiff's counsel's use of the term "lawyer trick."

Next, Superior contends that plaintiff's counsel improperly referred to Superior as a big corporation with 1,600 employees out of Chicago, Illinois. After noting in his opening statement as "background" information that Superior was "a big company out of Chicago" with 1,600 employees that contracted with Henry Ford Hospital to transport patients, plaintiff's counsel then pointed out that despite Superior's size and strict policies and procedures, no records regarding an internal investigation of this case or of communications between the company's Michigan officials and its central office in Chicago, where the risk manager is located, had been provided. While cross-examining Superior's vice-president regarding a dispute over a smaller corporation related to Superior, plaintiff's counsel asked, "So what's going on here is that you subsequently formed a Michigan corporation and you want, since it's a lot smaller than the big corporation you want this lawsuit to be against this little Michigan corporation rather than the people who employed you and the defendant drivers?" After the trial court overruled an objection based on relevance, plaintiff's counsel again asked, "Isn't it true, that that's another little lawyer game that is being played here trying to deny that these 2 employees were employees of the big corporation who had the ability to pay if this jury so finds." In closing argument, plaintiff's counsel, in responding to a criticism of plaintiff's liability expert, stated, "Do you know, that the Superior Ambulance company, a huge company, one of [the] biggest in the country couldn't find one EMT [emergency medical technician] expert to come here and testify that anything they did was correct in this case. Not one."

In context, these comments and questions were relatively discrete points made in reference to specific matters in dispute at trial, including whether Superior had investigated the rape, whether Superior was the proper defendant, and a criticism of plaintiff's expert. Superior's

corporate size was not such a constantly repeated theme so impressed in the minds of the jurors that an incurable error requiring reversal occurred. Cf. *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 110-111; 330 NW2d 638 (1982) (finding that repeated references to a corporation's wealth, power, and insensitivity, and its millionaire chairman, created a negative image that would have swayed jurors to alter their views of the evidence).[8]

Next, Superior asserts that plaintiff's counsel improperly elicited from plaintiff, Jane Doe's father, that his divorce was the result of this incident and that the events in this case caused him to suffer post-traumatic stress disorder (PTSD). It is true that plaintiff's counsel agreed before trial that he would not put in evidence of plaintiff's mental distress. Plaintiff's claims of negligent and intentional infliction of emotional distress, purportedly arising from the emotional trauma he suffered after learning that his daughter was raped in the ambulance as he was driving behind it, were dismissed before trial. *Doe*, unpub op at 2, 8. In his opening statement, plaintiff's counsel stated:

> Following behind that ambulance while this was going on was [plaintiff]. While his daughter was being raped, he was driving behind that ambulance oblivious to what was happening.

> I should tell you they have never recovered, he doesn't have a claim here, but he and his wife have divorced since then. She has never forgiven him.

Later in the trial, plaintiff's counsel elicited the following testimony from plaintiff:

> *Q.* Are you married?

---

[8] Superior asserts that plaintiff's counsel stipulated to rulings in limine that he would not refer to Superior's size, location, or number of employees; however, the transcript pages cited by Superior reflect that this "stipulation" was more qualified than Superior suggests. Plaintiff's counsel noted that certain documents produced by Superior, including its handbook, were admissible and that the documents referred to the number of ambulances Superior had, what the company was and what it was about, and its rules, regulations, and procedures; plaintiff's counsel asserted that the documents were relevant to Superior's responsibility in this case. Plaintiff's counsel explained that the documents were "relevant to impeachment if they claim they haven't reported anything to anybody. Because standing here today there is not one document in this case they have turned over where they reported to their company what happened in this case." The trial court then ruled that although the size or number of employees was generally not relevant, something could happen during the trial that made certain facts relevant; thus, the court said it would "hold off to see how the record comes in." The court further stated, "Clearly the plaintiff just can't simply say this is a big old corporation and they are deep pockets and this kind of thing. That's not going to fly." Plaintiff's counsel responded, "Nor would I." Given the context of plaintiff's counsel's comments at trial, Superior has failed to establish that the comments contradicted counsel's stipulation or the court's ruling.

*A.* Presently I am divorced. The divorce was final on November the 8th of last year.

*Q.* I'm sorry. How long were you married?

*A.* 38 years.

*Q.* Was there a precipitating factor in your mind about the divorce that had anything to do with this case at all?

*A.* Absolutely.

*Q.* What was that?

*MR. LIPE [defense counsel]:* Your Honor, I'm going to object to the relevance of this line of questioning he is not a claimant in this case.

*THE COURT:* Overruled.

*MR. FIEGER [plaintiff's counsel]:* That's right, but I am not making a claim –

*THE COURT:* Overruled. Proper.

*THE WITNESS:* My ex-wife always blamed me for the incident, and for a long time I blamed myself. She thought I should have known not to trust the ambulance drivers. But I put my faith in something, in them, and this is what happened.

Later in his testimony, plaintiff volunteered that he was suffering from PTSD:

*Q.* We have records to indicate that Trooper Tuckey found out about [the sexual assault] almost 3 days later, on the 27th, how did you happen to come in contact with Trooper Tuckey?

*A.* He called me up. But you have to remember right now, I'm being treated for post-traumatic stress syndrome –

*MR. LIPE:* Your Honor, I object, this witness –

*THE WITNESS:* – and so –

*MR. FIEGER:* I know it's not, but he can indicate –

*THE COURT:* Sidebar.

(At 9:18 a.m., sidebar conference off the record, not reported)

(At 9:19 a.m., back on the record, all parties present)

*THE COURT*:  All right.  The objection is overruled.  Go ahead.

*MR. FIEGER*:  Okay, thank you.

BY MR. FIEGER:

*Q*.  Go ahead you can explain.

*A*.  As I was saying, I'm being treated for post traumatic stress syndrome because of the incident and I have been ever since the incident.

Sometimes a part of the – I am seeing a lady named Doctor Penelope El, and part of the process of me healing is that we are trying to get me to forget about it.

So, if some of the things that I say, are slightly inaccurate.  It is not because of malice on my part, it's because that's how I remember it.

And when I was told, when Officer Tuckey told me it hit me like a ton of bricks.

Although plaintiff's counsel agreed before trial not to reference plaintiff's mental distress, the record indicates that plaintiff volunteered during his testimony that he was suffering from PTSD.  While the sidebar conference was not transcribed, it appears this testimony was permitted because plaintiff's PTSD therapy may have affected his ability at trial to recall certain events.  Further, Superior fails to develop an argument explaining why it was improper to refer to plaintiff's divorce.  Superior does not address plaintiff's contention that the divorce degraded the family support that Jane Doe needed following this incident.  Thus, Superior has not established that the comments and testimony on this point injected prejudice that resulted in an excessive damages award.

Superior next asserts that plaintiff's counsel improperly argued that O'Connell had a codified duty to immediately report his suspicions to the receiving hospital, contrary to this Court's prior published opinion in this case holding that Superior and O'Connell had no reporting duty under a child-protection statute, *Doe v Doe I (On Remand)*, 289 Mich App 211, 213; 809 NW2d 163 (2010), and contrary to plaintiff's counsel's stipulation before trial that there was no statutory reporting requirement.  It appears plaintiff's counsel did improperly argue that the duty was codified; counsel argued in closing, "They had an absolute duty under the law. The law is codified by the way.  They must—all suspicions must be reported to the medical personnel at the receiving hospital.  But that's just part of the duty to protect."  However, no objection was made with respect to this isolated assertion, and a curative instruction would have alleviated any prejudice.  *Thorin*, 203 Mich App at 704.  We are not convinced that the comment provoked an excessive damages award based on passion or prejudice, particularly given the trial court's instruction to follow the law as stated by the court.

Superior further contends that plaintiff's counsel improperly attempted to appeal to religious convictions during his opening statement by saying, "As I told you, this really devolves into just a religious precept of help they neighbor.  They betrayed their responsibility to protect

-15-

the safety of a child." There is no evidence that this minimal reference to religion, apparently to explicate the concept of a duty to protect when a special relationship exists, provoked an excessive damages award fueled by passion or prejudice. "The argument of counsel should not be so restricted as to prevent reference, by way of illustration, to principles of divine law or biblical teachings." *People v Mischley*, 164 Mich App 478, 483; 417 NW2d 537 (1987).

Superior complains of brief references in closing argument to past jury nullification practices in some states reflecting bias against African Americans. Superior fails to explain how it was prejudiced by these comments, and no objection was made.

Superior challenges plaintiff's counsel's assertion in closing that Superior presented its damages expert apparently hoping "that . . . there is somebody out there who is receptive to that, who is cynical about women being raped, who doesn't believe women suffer, who doesn't believe that rape is an act of violence, but it is really a sexual act. That there is somebody out there who believes that rape is pleasurable ultimately. . . ." Plaintiff's counsel was challenging a defense expert's view that the rape did not escalate Jane Doe's preexisting psychological problems, that she did not suffer from PTSD, and that she did not need additional treatment as a sexual abuse victim. Attorneys may use "hard language" and are not restricted to the blandest possible terms. *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). Although not stated directly, plaintiff's counsel's comments may also have been meant to counter any notion that Jane Doe, a 14-year-old child at the time, voluntarily participated in or enjoyed the sexual assault in light of her statement to police that was read to the jury.[9]

Superior complains of a comment by plaintiff's counsel in closing suggesting that Superior was hoping to find two jurors who would say it was okay to watch a child being raped for 50 minutes. As discussed, there was evidence that O'Connell thought or suspected that DeFillippo was sexually assaulting Jane Doe during the 50-minute transport, and plaintiff's counsel's theory was that O'Connell and Superior failed to protect Jane Doe from the ongoing assault by stopping the ambulance or calling the police. Plaintiff's counsel was permitted to draw reasonable inferences from the evidence, *In re Miller*, 182 Mich App at 77, and was not required to state his argument in the blandest possible terms, *Ullah*, 216 Mich App at 678.

Next, Superior contends that plaintiff's counsel argued to the jury an issue for which the jury had heard no evidence when counsel accused Superior of playing a corporate shell game even though, according to Superior, plaintiff's counsel had erroneously named a defunct corporation on the complaint. The premise of this contention is incorrect because evidence on this point was presented at trial; as discussed, plaintiff's counsel questioned Superior's vice-president regarding the formation of a Michigan corporation and whether employees received their paychecks from the Illinois corporation named in the complaint. Superior has failed to establish prejudicial misconduct on this point.

---

[9] As discussed below, Superior on appeal suggests that, based on Jane Doe's statement, she voluntarily participated in the sexual conduct.

Superior next argues that plaintiff's counsel improperly stated that rape is terrifying, brutal, and violent; it is not sexual in nature; and it is used as a tactic of war to terrorize. These observations regarding the nature of rape were likely meant to dispel any notion that Jane Doe, a 14-year-old child, voluntarily participated in the sexual assault in light of her statement to the police. The argument was not prejudicial misconduct.

Next, Superior contends that plaintiff's counsel improperly argued that a $25 million to $50 million award was not enough because a Picasso painting sold for $106.5 million, and then asked whether "[a] little girl who is made in God's image" was more valuable than a Picasso canvass. Plaintiff's counsel also asserted that "we build bombs and we build bombers to deliver them that costs [sic] hundreds of millions of dollars to kill people. We have got inter-continental ballistic missiles that cost hundreds of millions of dollars to deliver nuclear weapons. And now I'm here in a court in America to talk about what our children are worth." Plaintiff's counsel further stated that "we give the Congressional Medal of Honor to" deceased persons "[b]ecause it's a symbol. And that money ultimately is the only symbol of justice that you can do. It is the symbol." It appears these arguments were primarily intended to address the inherent difficulty of placing a monetary value on noneconomic damages. "[A] dollar amount can never truly be placed on an individual's pain and suffering." *Freed*, 286 Mich App at 336. Therefore, plaintiff's counsel apparently wished to discuss other situations where it may be difficult to assign a monetary value. Attorneys may refer to matters of common knowledge or settled history by way of argument or illustration. *People v Sesson*, 45 Mich App 288, 294; 206 NW2d 495 (1973). Although plaintiff's counsel's argument was somewhat hyperbolic, no objection was made at trial and a curative instruction would have alleviated any prejudice. *Thorin*, 203 Mich App at 704.

Overall, Superior has not shown that plaintiff's counsel's comments and questions, the vast majority of which Superior did not object to at trial, injected passion or prejudice that led the jury to render an excessive damages award. Contrary to Superior's contention, plaintiff's counsel here did not make prejudice-inviting assertions comparable to the invocations of the Holocaust and the German nationality of the corporate defendant at issue in *Gilbert*. Accordingly, Superior is not entitled to a new trial or remittitur on the basis of prejudice or passion.

Next, Superior contends that, apart from plaintiff's counsel's purported misconduct, reasonable minds would not deem the $10 million noneconomic damages award to fall within the limits of just compensation for the injuries sustained. Superior notes that the jury awarded $2.5 million in past economic damages, even though plaintiff presented evidence of only $130,000 in past economic damages,[10] suggesting that the jury decided to award more than what was necessary to make plaintiff whole. Regarding the nature of the noneconomic injury, Superior contends that the sexual assault was a one-time episode, Jane Doe was not abused by a person in a position of trust in her community, she was not required to report the incident because Superior did the reporting, and this was a low trauma incident. Superior states that no force was used, no

---

[10] The trial court granted remittitur with respect to past economic damages.

threats were made, and, according to Superior, Jane Doe willingly participated in the sex acts based on her statement to police.[11]

We do not find Superior's argument persuasive. Viewed in the light most favorable to plaintiff, the facts of this case are more disturbing than Superior suggests. Jane Doe, a mentally troubled, 14-year-old girl, attempted to commit suicide by making more than 40 cuts to her hands and wrists. After her wounds were sutured at a hospital, she was taken by ambulance to a psychiatric hospital and was strapped into a gurney for the 50-minute transport. During this transport, an ambulance attendant, DeFillippo, turned off the lights in the back of the ambulance and sexually assaulted her, kissing and fondling her breasts and digitally penetrating her vagina. The other ambulance attendant, O'Connell, who was driving, suspected the digital penetration was occurring and informed his supervisor, Jose, during the transport, but neither O'Connell nor Jose called the police. Although Jose instructed O'Connell to turn on the lights and have DeFillippo come up to the jump seat behind the driver's seat in order to "cover our butts[,]"[12] and DeFillippo briefly complied, DeFillippo then turned off the lights again and resumed the assault. O'Connell again told DeFillippo to come up to the jump seat, and he did so. Jose instructed O'Connell to keep the incident quiet so that it could be investigated, O'Connell did not inform the receiving hospital of the suspected assault, and O'Connell knew that DeFillippo submitted an EMS run sheet to the receiving hospital falsely saying that Jane Doe was transported "without incident."

A psychiatrist, Dr. Gerald Shiener, who saw Jane Doe twice, testified that the failure to disclose the rape to the hospital damaged her by preventing her sense of shame, self-blame, and guilt from being addressed, thereby entrenching the damaging effects of the trauma. In Dr. Shiener's view, Jane Doe suffered from PTSD as a result of the rape, and she did not have that condition previously. Dr. Shiener opined that before the rape, there was a hope that Jane Doe could overcome her psychological problems; after the rape, those hopes were dashed and it would be nearly impossible for her to overcome the effects of the incident. She now has difficulty trusting and forming relationships with men and trusting people who are there to help her. Jane Doe's statement to police indicated that she told DeFillippo she was a "slut" and that she wanted to be a "porn star[,]" which, according to Dr. Shiener, indicates how Jane Doe thinks about herself and the nature of her relationship with men after the sexual assault. Dr. Shiener further stated:

---

[11] Superior quotes portions of Jane Doe's statement to police in which she stated that during the incident, she took off her bra, lifted her gown and removed her underwear; that she "was really wet[;]" and that she "started rubbing [DeFillippo's penis] making him grunt." Superior also notes that Jane Doe's statement indicated she told DeFillippo that she enjoyed the incident and asked if he could find another girl for a future three-way sexual encounter.

[12] According to O'Connell, he and Jose were attempting to stop the suspected assault without confronting DeFillippo or alerting him that they knew the assault was occurring, to avoid escalating the situation into possible further violence.

-18-

I think her symptoms are going to cause impairments, impairments in getting close to other people, impairments in handling anxiety, impairments in being able to feel safe, impairments in expressing anger, impairments in how she thinks about herself.

That will interfere with her not only loving relationships but in work situations. If she gets too close to coworkers, if she gets angry at a supervisor or customer, she may not be, she won't be able to handle those feelings appropriately.

Even after a long-term hospitalization, Jane Doe continued to have impairments, including despondence and problems with closeness. She had other persisting problems, including difficulty with her sexuality and post-traumatic dreams of being raped, chased, and immobilized. Dr. Shiener opined that Jane Doe will require counseling and possibly medication for years, and ongoing, life-long treatment. She may need to live with her parents or in a group home because she cannot live alone.

Plaintiff, Jane Doe's father, testified that Jane Doe sees a psychologist but resists treatment and has low self-esteem. After the rape, Jane Doe became more violent, punching holes in walls at home and destroying a big-screen television set. She stayed in her room and did not want to see her friends. She has been hospitalized a number of times after the rape, including a stay at a facility in Utah for a year. Also, Jane Doe began cutting herself more often and more deeply after the rape.

Dr. Barbara Schiff, a clinical psychologist, saw Jane Doe for four and one-half hours. Dr. Schiff indicated that Jane Doe could not get out of bed, was in pain all the time, suffered from psychosomatic illnesses, was cutting herself again, was ashamed of cutting herself again, and was binging and purging. Dr. Schiff described the rape in the ambulance as being "like a tsunami" that "totally overwhelmed [her] by stimulation that she will never recover from. Because it is inside her system now, this overreaction." In Dr. Schiff's view, everything is worse from the rape and Jane Doe "is more emotionally disregulated. We are talking about the inability to identify and regulate the emotion." Dr. Schiff indicated that Jane Doe feels like she is falling down a black hole with no bottom, and "cutting feels better than that. Cutting feels [like] I am doing something. I am not crazy. I am cutting." It was important for Jane Doe to receive medical and psychological care immediately when she was delivered to the psychiatric hospital "because, she was allowed to feel, so horribly disgusted by herself and ashamed of herself for far too long. The longer that goes on, the greater the damage. As [sic] I mean that's common sense." Jane Doe cannot stand to be looked at and feels so ashamed of herself and "disgusted that she no longer has any of the extroversion she had before the rape" and does not want to get out of bed anymore. Her sleep problems became worse after the rape. Jane Doe suffers from PTSD; she can never fully recover but can get better with a lot of therapy and will need psychological services for the rest of her life.

Viewing the evidence in the light most favorable to the nonmoving party, *Heaton*, 286 Mich App at 539, we conclude that the noneconomic damages award of $10 million, while substantial, "falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation[.]" *Shaw*, 283 Mich App at 17. A basic rule of

tort law is that a defendant takes the plaintiff as the plaintiff exists, including any susceptibility to harm. *Wilkinson v Lee*, 463 Mich 388, 396-397; 617 NW2d 305 (2000). Jane Doe was a mentally troubled 14-year-old girl who had attempted suicide by cutting her hands and wrists. It was while in this condition that she was molested by DeFillippo in the back of the ambulance. O'Connell suspected the assault was occurring and notified his supervisor, both of whom failed to contact the police or immediately notify the receiving hospital of the suspected ongoing sexual assault. Testimony from Jane Doe's father and from a psychiatrist and a clinical psychologist indicated that the sexual assault, although a one-time incident, had a devastating psychological impact on Jane Doe, essentially fueling her self-destructive behaviors and preventing her from leading a normal functioning life.

Superior's contentions that DeFillippo did not hold a position of trust and that Jane Doe voluntarily engaged in the sexual conduct are unavailing. Jane Doe was in a uniquely vulnerable position as a fragile, 14-year-old child who had just cut herself more than 40 times and was being taken by ambulance to a psychiatric hospital. Given her age and her psychological and physical conditions, it is untenable to suggest that Jane Doe was in any position to "voluntarily" engage in sex acts with an ambulance attendant.[13] On balance, given the testimony regarding the significant psychological effects of the sexual assault, we hold that the noneconomic damages award was not outside the range of the evidence or the limits of what reasonable minds would deem just compensation.

Next, Superior contends that the $10 million noneconomic damages award exceeds comparable awards in cases involving more egregious conduct and injuries, making the verdict here clearly or grossly excessive. We conclude that Superior's proposed comparison of the award in this case to verdicts in other cases is not useful in resolving this issue.

> As noted by our Supreme Court [in *Precopio v Detroit*, 415 Mich 457, 471; 330 NW2d 802 (1982)], "no two cases precisely resemble one another" and "no two persons sustain the same injury or experience the same suffering." Recognizing those issues, it held that "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar." Moreover, a dollar amount can never truly be placed on an individual's pain and suffering. [*Freed*, 286 Mich App at 336 (quotation marks and citations omitted).]

In *Freed*, *id*. at 337, this Court upheld the denial of remittitur where the defendant "failed to adequately communicate how its 'analogous' cases take into account the factual differences in the injuries and the victims[.]"

---

[13] Indeed, given her age and history and the medical testimony regarding the self-blame, shame, and disgust that Jane Doe felt as a result of the incident, as partially reflected in her statement to the police referring to herself as a "slut" who wanted to be a "porn star," the jury may reasonably have concluded that any supposedly "voluntary" participation in or "enjoyment" of the sex acts was not a mitigating factor in Jane Doe's psychological trauma.

Likewise, in *Shaw*, 283 Mich App at 19-21, this Court rejected an argument that the amount of noneconomic damages awarded in that case far exceeded the amounts awarded in comparable cases. The *Shaw* Court noted that certain examples the defendant set forth were deficient due to factual differences or the age of the cases, and rejected the defendant's reliance on five trial court judgments that provided no explanation for the amount of damages awarded. *Id*. at 19-20. The plaintiff also listed several purportedly comparable cases that included trial court judgments that did not explain the amount of the awards. *Id*. at 20. This Court stated: "Given the wide range of awards in the cases cited by the parties and the evidence [the plaintiff] presented at trial regarding the emotional and mental anguish he suffered because of defendant's actions, we hold that the trial court properly denied defendant's request for remittitur." *Id*.

Here, Superior offers Michigan Lawyer's Weekly summaries of verdicts and settlements in other cases involving sexual abuse, with the largest Michigan verdict being $5.52 million, which Superior says might have included future damages and economic damages. Superior also cites a published and an unpublished opinion of this Court in cases where damages were awarded for sexual abuse claims. In turn, plaintiff cites verdicts obtained by plaintiff's counsel's firm, including a 1998 verdict for $8 million in a sexual assault case,[14] and trial court judgments from other jurisdictions in which sexual abuse victims were awarded amounts as high as $41 million.

We find that the purportedly comparable verdicts and settlements cited by the parties are not useful in analyzing whether Superior is entitled to remittitur. Like the defendant in *Freed*, 286 Mich App at 337, Superior fails to adequately explain how its supposedly analogous cases take into account factual differences in the injuries sustained and the victims. As discussed, plaintiff presented testimony explaining Jane Doe's uniquely fragile state when she was molested and the extensive psychological trauma inflicted on her as a result of the sexual assault. Superior fails to demonstrate whether or how the damages in the other cases on which it relies were comparable to the damages established here.[15] Nor does Superior develop a meaningful appellate argument regarding whether the Michigan Lawyer's Weekly summaries or appellate opinions that it has cited adequately explain the amounts of damages awarded in those cases. An appellant may not leave it up to this Court to develop the party's argument. *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002). As in *Shaw*, 283 Mich App at 20, "[g]iven the wide range of awards in the cases cited by the parties and the evidence [plaintiff] presented at trial regarding the emotional and mental anguish [Jane Doe] suffered because of [Superior's negligence], . . . the trial court properly denied [Superior's] request for remittitur."

---

[14] This verdict was referenced in *Scottsdale Ins Co v Roumph*, 18 F Supp 2d 730, 731 (ED Mich, 1998), aff'd 211 F3d 964 (CA 6, 2000).

[15] In addressing Superior's argument on this issue, the trial court implicitly noted Jane Doe's unique vulnerability and the absence of similar facts in the purportedly comparable cases: "Let's try to understand what the word similar cases mean, let's see are the cases really similar with a 14-year old, mentally ill female, who hours before she is raped attempts suicide. Pretty serious stuff. And a jury may have reacted only to those facts."

Superior's next argument on appeal is that the trial court erred in denying Superior's motions for a directed verdict and a JNOV because, in Superior's view, it is entitled to immunity under the emergency medical services act (EMSA), MCL 333.20901 *et seq.*, and plaintiff's claims sound in medical malpractice rather than ordinary negligence. We disagree.

Generally, an issue must have been raised before, and addressed and decided by, the trial court to be preserved for appellate review. *Hines*, 265 Mich App at 443. Superior raised this issue below when it moved for a directed verdict and a JNOV, and the trial court addressed and decided the issue when it denied those motions. Accordingly, the general issue is preserved. However, as explained below, Superior waived aspects of this issue by speaking in its opening statement and eliciting testimony at trial about the EMS standards of care, rules, and protocols about which it complains on appeal, and by expressly declining to object to the admission of the EMS protocols as an exhibit. Waiver eliminates any error. *The Cadle Co v Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009).

"This Court reviews de novo a trial court's decision with regard to both a motion for a directed verdict and a motion for JNOV." *Taylor v Kent Radiology, PC*, 286 Mich App 490, 499; 780 NW2d 900 (2009). "A trial court properly grants a directed verdict only when no factual question exists upon which reasonable minds could differ. Similarly, a motion for JNOV should be granted only when there was insufficient evidence presented to create an issue of fact for the jury." *Heaton*, 286 Mich App at 532 (citation omitted). The testimony and all legitimate inferences must be viewed in the light most favorable to the nonmoving party. *Id*. Whether the law-of-the-case doctrine applies is a question of law that this Court reviews de novo. *KBD & Assoc, Inc*, 295 Mich App at 679. This Court also reviews de novo whether a claim is for ordinary negligence or medical malpractice. See, generally, *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 419; 684 NW2d 864 (2004).

As discussed above, "[t]he law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue." *KBD & Assoc, Inc*, 295 Mich App at 679. However, the law-of-the-case doctrine controls only if the facts remain materially the same. *South Macomb Disposal Auth v American Ins Co*, 243 Mich App 647, 655; 625 NW2d 40 (2000). In the prior appeal, this Court held that Superior and O'Connell were not entitled to immunity under the EMSA because "[i]t is undisputed that the services being provided by defendants in this matter concerned merely the provision of transport and not medical treatment. As such, and in accordance with the plain statutory language, MCL 333.20965(1)[16] is inapplicable to the circumstances of this case." *Doe*, unpub op at 5 (footnote added).

---

[16] MCL 333.20965(1) provides, in relevant part, that unless an act or omission is the result of gross negligence or willful misconduct, the acts or omissions of a medical first responder or EMT consistent with the individual's licensure or additional training do not impose liability in the treatment of a patient. This Court concluded that the gross negligence or willful misconduct standard in the statute applies only to acts or omissions in the *treatment* of a patient. *Doe*, unpub op at 5.

The law-of-the-case doctrine controls the issue of EMSA immunity because the facts on remand remained materially the same. Contrary to Superior's argument, plaintiff did not alter the theory of liability at trial to address medical treatment as opposed to the provision of transport. As reflected in plaintiff's counsel's opening statement and closing argument, the trial court's jury instructions, and the verdict form, plaintiff continued to assert at trial, consistent with the theory of liability asserted at the time of the prior appeal, that Superior failed to protect Jane Doe from the sexual assault in the context of a special relationship and failed to properly supervise and train employees in connection with the sexual assault during the transport of Jane Doe.

The admission of EMS protocols[17] did not alter the theory of liability. Superior's counsel effectively agreed to the use of the protocols at trial by initiating a discussion of them in his opening statement and by asking questions of witnesses about the protocols; further, Superior's counsel expressly declined to object to the admission of the protocols as an exhibit. Superior's participation in the use of the protocols constituted a waiver that eliminated any error. *The Cadle Co*, 285 Mich App at 255. An appellant may not assert error on the basis of something that its own counsel deemed proper at trial, as this would allow the party to harbor error as an appellate parachute. *Marshall Lasser*, *PC v George*, 252 Mich App 104, 109; 651 NW2d 158 (2002).

Further, the testimony of a flight nurse/EMT as a liability expert for plaintiff did not convert the focus of the case to medical treatment as opposed to the provision of transport. The expert's testimony focused on the same theory of liability asserted throughout the litigation. The expert opined that Superior did not meet standards for the safe *transport* of a pediatric patient. The expert contended that O'Connell should have stopped the ambulance and protected Jane Doe from further harm or, if O'Connell felt unsafe intervening directly, he should have called the police about the sexual assault. The expert further opined that once O'Connell texted his supervisor, Jose, about what was occurring, Jose should have stopped the transport and called the police. The expert stated that it is common sense to call the police when a child is being raped and that no special training is needed to know this. Because plaintiff's liability expert's testimony was focused on the provision of transport and the failure to stop or report the sexual assault, this testimony did not change plaintiff's theory of liability.

Thus, the law-of-the-case doctrine controls the issue of EMSA immunity because the facts on remand remained materially the same. As such, the trial court properly denied Superior's motions for a directed verdict and a JNOV on this issue.

For the same reasons, Superior has failed to establish that the case sounds in medical malpractice rather than ordinary negligence. "[A] court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Bryant*, 471 Mich at 422.

---

[17] Although the protocols cover a wide range of topics, the protocols that were the primary focus at trial concerned the transport of patients and the requirements for reporting suspected abuse.

If the reasonableness of the health care professionals' actions can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence. If, on the other hand, the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved. [*Id.* at 423.]

Again, Superior acquiesced in the admission and discussion of the protocols about which it complains on appeal; in any event, the protocols that were the focus at trial concerned primarily the transport of a patient and the reporting of suspected abuse, rather than medical treatment. Moreover, as discussed, plaintiff's liability expert's testimony did not alter plaintiff's "ordinary negligence" theory of liability. Throughout trial, the central issue was whether Superior failed to take sufficient actions to report or stop the ongoing sexual assault of Jane Doe in its ambulance and failed adequately to train or supervise employees in connection with this incident. Determining the reasonableness of Superior's acts or omissions in this case did not raise issues of medical judgment that fell outside the jurors' common knowledge and experience.

## II. DOCKET NO. 310019

Superior argues that the trial court abused its discretion in determining the amount of attorney fees awarded with respect to two of plaintiff's attorneys. "We review for an abuse of discretion a trial court's award of attorney fees and costs. An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008) (citation omitted).[18]

In *Wood v Detroit Auto Inter-Ins Exch*, 413 Mich 573, 588; 321 NW2d 653 (1982), the Michigan Supreme Court listed six factors relevant to computing a reasonable attorney fee:

(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. [Quotation marks and citation omitted.]

In *Smith*, the Court noted that the eight factors listed in MRPC 1.5(a), which overlap the *Wood* factors, have also been used to determine reasonable attorney fees:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

---

[18] Our citations to *Smith* in this opinion are to the lead opinion by TAYLOR, C.J.

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent. [*Smith*, 481 Mich at 530, quoting MRPC 1.5(a).]

The *Smith* Court held that some fine-tuning of the multifactor approach was needed:

We hold that a trial court should begin its analysis by determining the fee customarily charged in the locality for similar legal services, i.e., factor 3 under MRPC 1.5(a). In determining this number, the court should use reliable surveys or other credible evidence of the legal market. This number should be multiplied by the reasonable number of hours expended in the case (factor 1 under MRPC 1.5[a] and factor 2 under *Wood*). The number produced by this calculation should serve as the starting point for calculating a reasonable attorney fee. We believe that having the trial court consider these two factors first will lead to greater consistency in awards. Thereafter, the court should consider the remaining *Wood*/MRPC factors to determine whether an up or down adjustment is appropriate. And, in order to aid appellate review, a trial court should briefly discuss its view of the remaining factors. [*Smith*, 481 Mich at 530-531.]

"In determining the fee customarily charged in the locality for similar legal services, the trial courts have routinely relied on data contained in surveys such as the Economics of the Law Practice Surveys that are published by the State Bar of Michigan." *Id*. at 530 (quotation marks omitted). The fee customarily charged in the locality for similar legal services "is reflected by the market rate for the attorney's work. The market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." *Id*. at 531 (quotation marks and citations omitted). The fee applicant must present evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id*. (quotation marks and citation omitted). The *Smith* Court cautioned courts "to avoid duplicative consideration of the factors mentioned above." *Id*. at 534.

Superior challenges the determination of attorney fees with respect to two of plaintiff's attorneys, Geoffrey Fieger and William McHenry.[19] In determining the market rates for those

_____

[19] Superior does not challenge the fee awards to two other attorneys, Heather Glazer and Matthew Klakulak.

-25-

two attorneys, the court used the 2010 Michigan Bar survey to determine that a reasonable hourly rate for Fieger was $490 and a reasonable hourly rate for McHenry was $425 for part of his time and $465 for part of his time.[20] The court classified these attorneys as being in the "95th percentile" because of their excellent professional standing and calculated the fees accordingly. The court then determined that the reasonable number of hours expended were 215.1 for Fieger and 473.6 for McHenry. Multiplying the reasonable hourly rates by the reasonable numbers of hours expended, the court calculated that the base fee for Fieger was $105,399 and the base fee for McHenry was $206,940. The court then turned to the additional *Wood*/MRPC factors to determine whether an upward or downward adjustment of the base number was appropriate. The court noted that *Smith* cautions to avoid duplicative consideration of factors already mentioned. On that basis, the court declined to consider certain factors not relevant here. The court then turned to the seventh MRPC factor—the experience, reputation, and ability of the lawyer or lawyers performing the services. The court noted that "Mr. Fieger has substantial and extraordinary experience as a litigator. This factor warrants a reasonably substantial upward adjustment. Accordingly, an upward adjustment to the baseline figure is warranted, and the Court believes $150,570 (215.1 hours multiplied by $700) is a reasonable attorney fee for Mr. Fieger." For McHenry, the court noted that "Mr. McHenry is an experienced litigator and an upward adjustment is warranted here as well. Thus, the Court concludes that $219,945 (332.1 hours multiplied by $450 and 141 hours multiplied by $500) is a reasonable attorney fee for Mr. McHenry."

We conclude that the trial court properly calculated the amount of attorney fees awardable to plaintiff with respect to the attorneys in question. In our opinion, the trial court made sufficient findings of fact and considered all the relevant factors before concluding that it was reasonable to award higher-than-average fees for the services of Fieger and McHenry. *Wood*, 413 Mich at 588; *Crawley v Schick*, 48 Mich App 728, 737; 211 NW2d 217 (1973). In addition, it appears that the court took steps to ensure that it was avoiding duplicative consideration of the factors. We cannot conclude that the trial court's attorney-fee awards constituted an abuse of discretion.

Affirmed.

/s/ Patrick M. Meter
/s/ Kathleen Jansen
/s/ Kurtis T. Wilder

---

[20] Two market rates were determined for McHenry because he was initially an associate of Fieger's law firm but then became a solo practitioner during this litigation.